Selester GILTY, Plaintiff–Appellant,

v.

VILLAGE OF OAK PARK,
Defendant–Appellee.

No. 89–2764.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 6, 1990.

Decided Dec. 7, 1990.

**1248**

Armand L. Andry, Oak Park, for plaintiff-appellant.

Richard A. Martens, Chicago, for defendant-appellee.

Before WOOD, Jr., CUDAHY, and RIPPLE, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

In 1985, Selester Gilty misrepresented his academic credentials in order to gain a promotion. Now, some years and several misrepresentations later, he alleges racial discrimination in his employer's failure to promote him and later decision to discharge him. But Gilty's claims collapse of their own weight, and we affirm the district court's grant of summary judgment in favor of his employer.

## I.

Every three years the police department of the Village of Oak Park ("Village") constructs an "eligibility list" of those officers seeking promotion to the rank of sergeant. That list ranks names on the basis of a three-part examination: a written test (50%); a performance evaluation (30%); and an oral interview (20%).[1] For the next three years, the candidate at the top of the eligibility list will be promoted to the rank of sergeant as a vacancy arises.

Some time prior to 1985, Selester Gilty, a black officer, decided that he wanted to be a sergeant, and underwent the promotional examination necessary to be placed on the April 6, 1985, eligibility list. During his oral interview in March 1985, he represented to the Board of Fire and Police Commissioners of the Village of Oak Park ("Commission") that he held a bachelor's degree

---

1. The mechanics of this promotional process are governed by a settlement order dated August 12, 1983, and a settlement agreement incorpo-rated therein. *See Gilty v. Fire & Police Commissioners,* No. 83 C 727 (N.D.Ill. Aug. 12, 1983).

in psychology and that he was working on a master's degree in public administration. Those representations, as his employer later discovered, were false.

When the April 6, 1985, eligibility list was posted, Gilty ranked thirty-third on a list of fifty-one candidates. This rank was particularly difficult for him to understand in that he had received one of the eleven highest scores on the written test. His score on the performance evaluation, however, was quite low (22.977/30). Indeed, it was the lowest score for any officer in his division. Furthermore, four other black officers who had sought promotion had received among the lowest performance evaluation scores in their respective divisions. And on top of it all, Gilty was aware of no black person who was or ever had been a police sergeant or lieutenant in the Oak Park Police Department.[2]

On August 14, 1987, Gilty filed a complaint to redress what he considered to be racial discrimination, as manifested by the subjective performance evaluation completed by his white supervisors. Count I alleged a pattern and practice of disparate treatment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a). Count II was entitled "Title VII—Disparate Impact" and simply alleged, "The promotion process utilized by the defendant had a disproportionate and discriminatory impact on all Black candidates for sergeant including the plaintiff...." Gilty did not seek to represent a class.

Thereafter, on August 31, 1987, William Kohnke was appointed as the Village's new chief of police. Four to five months after arriving, Kohnke initiated the Integrated Criminal Apprehension Program ("ICAP") in his department. The purpose of ICAP was to improve the police force by integrating its elements. As part of ICAP, Kohnke asked all sworn officers to complete a form entitled "Profile of Training and Interest in Future Training" and also examined each officer's personnel file.

During this period, Kohnke began to suspect that at least one officer—Tom Stec, a white officer—had falsified his academic credentials. As a result of these suspicions, Kohnke compared the ICAP forms with information that officers had provided in the 1985 promotional examinations. If he found a discrepancy, or if he found no documentation in the officer's personnel file, Kohnke sent a letter requesting that the officer verify the academic experience or training. In all, Kohnke sent nineteen letters requesting verification.

One of Kohnke's letters was addressed to Gilty. On his ICAP form, Gilty had again stated that he held a bachelor's degree. But in response to Kohnke's letter, Gilty did not produce verification of his academic credentials. Of the original nineteen, only he and Stec were either unwilling or unable to back up their claims.

Kohnke undertook a formal interrogation of first Stec, and then Gilty, in March 1988. When they were unable to either verify their credentials or produce a credible explanation for their representations, both were charged with falsifying their academic credentials. Stec resigned. Gilty, on the other hand, amended his complaint to add a charge of retaliation under 42 U.S.C. § 2000e–3.

The district court, on the Village's motion for summary judgment, found Gilty's defense "incredible." *Gilty v. Village of Oak Park*, No. 87 C 7178, 1989 WL 84398 (N.D.Ill. July 19, 1989). The evidence clearly showed that in 1985 he did not have a bachelor's degree in psychology and was not pursuing a master's degree in public administration. He had attended the University of Illinois at Chicago Circle, but admitted that when he withdrew in 1976 he was on academic probation and that his grade point average was somewhere in the range of 1.6 to 1.8 on a five-point scale (with a 2.0 average required for graduation). Moreover, the record indicates that Gilty was on probation every quarter following his first, was dropped twice for poor

---

**2.** As of 1989, that observation was no longer true—one black officer had become a sergeant and another a deputy chief.

academic performance, had not declared a major in psychology, and withdrew while at least thirty-eight hours short of any degree.

As to his claim of pursuing a master's degree, Gilty had taken courses as a student at large in a nondegree program at Governor's State University. He was suspended, however, in December 1983 for his failure to maintain a 3.0 grade point average. At the time of his statements in 1985, he was not enrolled in a master's program anywhere.

When interrogated by Kohnke in March 1988, Gilty claimed that he had a bachelor's degree from Lewis University and that a document evidencing the degree would be provided upon request. No such document existed at the time, though, and Gilty knew it, because he had not passed that school's writing proficiency examination. In letters dated April 8, 1987; June 29, 1987; July 15, 1987; October 20, 1987; and December 22, 1987, the school advised him that he could not get a degree unless and until he passed a writing proficiency examination. During his interview with Kohnke, he nevertheless stated that he had passed the writing proficiency examination, although he knew at the time that he had taken and failed the examination on February 19, 1987; July 2, 1987; October 8, 1987; and March 21, 1988, only four days before.[3]

On July 18, 1988, the district court granted the Village's motion for summary judgment, largely on the basis of Gilty's own conduct. That decision is now before us on this appeal.[4] Relying on the same rationale as the district court, we affirm.

## II.

 As always, we review de novo a district court's decision to grant a motion for summary judgment and apply the same standard as that employed by the district court. *Bank of Waunakee v. Rochester*

*Cheese Sales, Inc.*, 906 F.2d 1185, 1188 (7th Cir.1990). When a party seeks relief under Title VII, that standard involves a tripartite order and allocation of the burden of persuasion. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–56, 101 S.Ct. 1089, 1093–95, 67 L.Ed.2d 207 (1981) (disparate treatment); *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425–26, 95 S.Ct. 2362, 2375–76, 45 L.Ed.2d 280 (1975) (disparate impact); *Holland v. Jefferson Nat'l Life Ins. Co.*, 883 F.2d 1307, 1313 (7th Cir.1989) (retaliation). Thus, Gilty, at a minimum, must be able to establish a prima facie case in order to withstand summary judgment. *Morgan v. Harris Trust & Sav. Bank*, 867 F.2d 1023, 1027–28 (7th Cir.1989); *see also United Assoc. of Black Landscapers v. City of Milwaukee*, 916 F.2d 1261, 1264, 1267–68 (7th Cir.1990). Gilty must also be able to rebut any nondiscriminatory explanation that the Village may offer. *See Kier v. Commercial Union Ins. Cos.*, 808 F.2d 1254, 1259 (7th Cir.), *cert. denied*, 481 U.S. 1029, 107 S.Ct. 1955, 95 L.Ed.2d 528 (1987); *see also Fitzpatrick v. Catholic Bishop*, 916 F.2d 1254, 1256 (7th Cir.1990) ("The days are gone, if they ever existed, when the nonmoving party could sit back and simply poke holes in the moving party's summary judgment motion.").

### A. *Disparate Treatment*

 To establish a prima facie case as to his disparate treatment (i.e., intentional discrimination) claim, Gilty may take one of two routes. He may either offer direct evidence of intentional discrimination or he may offer evidence of a combination of circumstances from which we may infer discriminatory intent. *Randle v. LaSalle Telecomms., Inc.*, 876 F.2d 563, 569 (7th Cir.1989). The latter route, detailed in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), generally involves four elements:

---

3. On September 14, 1988, the Commission discharged Gilty from the Oak Park Police Department. Its written opinion, adopted September 24, 1988, concluded that Gilty had lied and found that his testimony was not credible.

4. Additionally before us are two motions by the Village concerning statements made by Gilty in his reply brief. The first is a motion to strike such statements. The second is a motion for sanctions.

1. The plaintiff belongs to a class protected by Title VII;

2. The plaintiff applied and was qualified for a job for which the employer was seeking applicants;

3. The plaintiff, despite being qualified, was rejected; and

4. After the employer rejected the plaintiff, the position remained open and the employer continued to seek applicants from persons of comparable qualifications.

See id. at 802, 93 S.Ct. at 1824; Lowe v. City of Monrovia, 775 F.2d 998, 1005 (9th Cir.1985).

The district court opinion took the position that Gilty had chosen the McDonnell Douglas route, and analyzed his claim under the four-factor test listed above. The result was summary judgment in favor of the Village on the grounds that Gilty was not "qualified" for the position of police officer, much less sergeant, in view of his misrepresentations concerning his educational background. On appeal, Gilty's somewhat opaque briefs do not appear to argue that he did not misrepresent his academic credentials—a wise choice on this record. Instead, Gilty makes "even if I did" arguments, only two of which merit discussion.

■ First, Gilty points out that the Village's knowledge of his lies and misrepresentations arose no sooner than 1988, a date well after the allegedly discriminatory performance evaluation had been made. In

light of this fact, Gilty argues that the Village cannot now use this knowledge to explain, ex post facto, its 1985 decision. But his argument is specious.

■ As do the rest of the McDonnell Douglas factors, the determination of whether a plaintiff is "qualified" requires an objective analysis. As such, an employer's knowledge or lack of knowledge is of no relevance at the prima facie stage of the case. See Mister v. Illinois C.G.R.R., 832 F.2d 1427, 1437–38 (7th Cir.1987) (upholding dismissal of plaintiff's employment discrimination claim relying in part on ground that plaintiff lied about his employment history on his job application, even though it was "open to question whether the [employer] would have checked [the plaintiff's] history before hiring him").[5]

Under an objective standard, Gilty simply cannot meet the quasi-standing elements set out in McDonnell Douglas. He does not argue, nor does case law support, the notion that "qualified" law enforcement officers need not be "truthful" law enforcement officers. See, e.g., Grabinger v. Conlisk, 320 F.Supp. 1213, 1219–20 (N.D. Ill.1970) (citing Gardner v. Broderick, 392 U.S. 273, 277–78, 88 S.Ct. 1913, 1915–16, 20 L.Ed.2d 1082 (1968)), aff'd, 455 F.2d 490 (7th Cir.1972). Instead, he argues that his office required only a high school diploma or its equivalent. But the point is not that Gilty needed, but did not have, a bachelor's degree or a master's degree. The point is that he lied.[6]

---

5. Lest one think this conclusion anomalous, remember that the street is not one-way; Gilty cannot use the Village's lack of knowledge to excuse his own lack of qualification any more than the Village could use its own purported lack of knowledge to reduce Gilty's level of qualification. Moreover, if Gilty could make a prima facie case, then the Village would be required to offer a nondiscriminatory explanation for its actions. At that stage, however, the Village could not rely upon information obtained after Gilty's evaluation had been completed. Eastland v. TVA, 704 F.2d 613, 626 (11th Cir.1983), cert. denied, 465 U.S. 1066, 104 S.Ct. 1415, 79 L.Ed.2d 741 (1984).

6. Moreover, Gilty must fail even under a subjective standard. For in order to succeed under

McDonnell Douglas, he must establish that a job opening existed at the time of the Village's lack of knowledge. Yet nowhere in his briefs has he established that another officer was promoted prior to the time when the Village discovered his misrepresentations. Moreover, our search of the record reveals that two officers from the April 6, 1985, Eligibility List were promoted, but nowhere does the record disclose the dates of those promotions. For all we know, the job openings arose after the Village's knowledge of Gilty's indiscretions, and discrimination, even of the most grievous sort, cannot establish a prima facie case under the McDonnell Douglas standard unless a plaintiff can associate it with a job opening. See McDonnell Douglas, 411 U.S. at 802, 93 S.Ct. at 1824.

Gilty's second "even if I did" argument is to brush aside what he considers the narrow limitations of the *McDonnell Douglas* standard. Gilty tells us that he has proffered "direct evidence" of discrimination. This case, he argues, is a "pattern and practice" case that challenges the Village's entire course of conduct toward the members of a protected class. And to that effect he puts forth substantial anecdotal evidence in which other black officers were the object of racial slurs or discriminatory conduct.

Gilty's general statement on the law is correct; a plaintiff is not required to use the *McDonnell Douglas* method. *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977); *Randle*, 876 F.2d at 569. But Gilty filed an individual claim; this is not a class action. Consequently, his evidence of a pattern and practice "can only be collateral to evidence of specific discrimination against the actual plaintiff." *Williams v. Boorstin*, 663 F.2d 109, 115 n. 38 (D.C.Cir.1980), *cert. denied*, 451 U.S. 985, 101 S.Ct. 2319, 68 L.Ed.2d 842 (1981); *see also Babrocky v. Jewel Food Co.*, 773 F.2d 857, 866 n. 6 (7th Cir.1985) (noting that "pattern and practice" argument "seems to be misplaced" in nonclass suit); B. SCHLEI & P. GROSSMAN, EMPLOYMENT DISCRIMINATION LAW 1322 & n. 95 (2d ed. 1983) ("Pattern-and-practice suits, by their very nature, involve claims of classwide discrimination."). Like our peers in *Boorstin*, we deplore whatever instances of racial discrimination have occurred at the Oak Park Police Department, and we applaud any efforts to redress those violations of civil rights, but we fail to see how Gilty's broad-based evidence is more than collaterally relevant to his individual claim.[7]

As the Supreme Court noted in *Cooper v. Federal Reserve Bank*, 467 U.S. 867, 104 S.Ct. 2794, 81 L.Ed.2d 718 (1984):

The crucial difference between an individual's claim of discrimination and a class action alleging a general pattern or practice of discrimination is manifest. The inquiry regarding an individual's claim is the reason for a particular employment decision, while "at the liability stage of a pattern-or-practice trial the focus often will not be on individual hiring decisions, but on a pattern of discriminatory decisionmaking."

*Id.* at 876, 104 S.Ct. at 2799 (quoting *International Bhd. of Teamsters*, 431 U.S. at 360 n. 46, 97 S.Ct. at 1867 n. 46). Constrained as we are by the nature of Gilty's own complaint, we must look for evidence of intentional discrimination directed at Gilty. But while Gilty has been diligent in his attempts to point out incidents of discrimination directed against others, the record contains comparatively little evidence of incidents of discrimination directed against him.

Summarized in the light most favorable to him, that relatively small amount of evidence supports only the proposition that Gilty received a low score on the performance evaluation and that his superior was pleased to give him that score because Gilty was, in the superior's view, "worthless." This evidence, however, establishes nothing more than a personal dislike. It does not demonstrate that the Village intentionally used race-based considerations in evaluating Gilty. *Randle*, 876 F.2d at 570 (declining to find evidence of discrimination in statement when it was "simply not possible to tell whether the statement was racially motivated"). Nor does this evidence provide a basis for inferring a "causal link" between Gilty's race and his failure to be promoted. *See Morgan*, 867 F.2d at 1026. Insofar as Gilty's individual claims are concerned, his "direct" evidence of discrimination against others is hardly direct, and he has not made a prima facie showing of

7. In view of our conclusion that this type of evidence is of only collateral importance in Gilty's individual claim, we do not have to rule on the Village's motion to strike, which dealt in large part with statements supporting Gilty's pattern and practice claim. Moreover, we reject

Gilty's argument that he should have been able to conduct continued discovery in search of more evidence of broad-based discrimination. It was entirely proper for the district court to deny his discovery requests in light of the limit-

disparate treatment.[8] *See Robinson v. Montgomery Ward & Co.*, 823 F.2d 793, 797 (4th Cir.1987) ("At any rate, no evidence exists that [the defendant] ever addressed any racially derogatory remark to the plaintiff...."), *cert. denied*, 484 U.S. 1042, 108 S.Ct. 773, 98 L.Ed.2d 860 (1988); *cf. Minority Police Officers Ass'n v. City of South Bend*, 801 F.2d 964, 967 (7th Cir.1986) (rejecting equal protection challenge when "[n]o plaintiff has been able to point to a single instance in which one of the officers evaluating them had evidenced racial animosity against them *personally*.") (emphasis added); [9] *see also Morgan*, 867 F.2d at 1026 ("[s]ummary judgment will not be defeated simply because issues of motive or intent are involved").

■ Even if one assumes that Gilty's conglomeration of evidence establishes a prima facie case of disparate treatment, *see United Assoc. of Black Landscapers*, at 1266, the disparate treatment claim must still fail in light of Gilty's failure to establish that he would have been promoted in the absence of the Village's alleged discrimination. "As in any tort case, statu-

tory or otherwise, a plaintiff cannot win a discrimination case if the harm to him would have been the same whether or not the defendant had discriminated." *Washington v. Electrical Joint Apprenticeship & Training Committee*, 845 F.2d 710, 712 (7th Cir.) (plaintiff challenged oral interview portion of program application but not written examination), *cert. denied*, 488 U.S. 944, 109 S.Ct. 371, 102 L.Ed.2d 360 (1988); *see also Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 285–87, 97 S.Ct. 568, 575–76, 50 L.Ed.2d 471 (1977); *Button v. Harden*, 814 F.2d 382, 383 (7th Cir.1987). Here, if Gilty had received a perfect score on the performance evaluation (30/30), he would have placed only fifth on the eligibility list. If Gilty had received the highest score given any candidate (28.845/30), he would have placed eighth on the eligibility list. Under those circumstances, a lack of disparate treatment, if it existed in the first place, would not have affected the final outcome because Gilty would not have been among the two candidates selected from the April 6, 1985, eligibility list.[10]

---

ed relevance of the evidence that such discovery would produce.

8. To a certain extent, Gilty also relies on underrepresentation statistics to support his disparate treatment claim. But "[s]tatistics, all-important in class actions and adverse impact cases, are of relatively low importance in an individual disparate treatment case." B. SCHLEI & P. GROSSMAN, *supra*, at 15; *see also id.* at 1315 & n. 72 ("statistics are rarely determinative in individual disparate treatment cases"). Standing virtually alone, as they are in this case, statistics cannot establish a case of individual disparate treatment. *See Carmichael v. Birmingham Saw Works*, 738 F.2d 1126, 1131 (11th Cir.1984).

9. *Minority Police Officers* also rejects the argument that a subjective evaluation of black officers conducted by white officers is inherently discriminatory. 801 F.2d at 967.

10. Gilty's only potentially meritorious argument in response is that the entire performance evaluation was poisoned—white officers were receiving disproportionately high scores at the same time that the black officers were receiving disproportionately low scores. Gilty does not seem to have specifically spelled out this argument in his complaint or in response to the Village's motion for summary judgment, but it seems a crabbed interpretation of his claim to penalize him for that failure. Inflation and

deflation of scores are really just two sides of the same coin. To hold to the contrary would limit Gilty to the argument that his supervisors evaluated black officers in a blatantly discriminatory manner and then, in a transformation worthy of Dr. Jekyll, evaluated the white officers without a hint of discrimination pervading their decisions.

The problem, though, is that Gilty has challenged only the performance evaluation. By not challenging the written examination and the oral interview components, he has admitted that 70% of the promotional process is valid. Furthermore, the officer ranked second on the promotional list had a total score of 90.304/100, whereas Gilty had a total score of only 82.267/100. Thus, Gilty must be able to explain a shift of at least 8.038 points, all of which have to come from the performance evaluation.

On the performance evaluation, however, the scores of the fifty-one officers on the eligibility list ranged from a low of 22.977/30 (Gilty's score) to a high of 28.845/30, a range of only 5.868 points. If Gilty had received the highest score given to any of the fifty-one officers, 28.845/30, he would still need to explain 2.170 points as overinflation of the scores of white officers. Moreover, even if Gilty had received a perfect score, a possibility for which there is no evidence, he would recover only 8.023 of the 8.038 points that he needs to illustrate causation.

**1254**

## B. *Disparate Impact*

■■■■ The prima facie showing necessary for a disparate impact (i.e., discriminatory effect) case is of a different sort. These claims involve allegations that a facially neutral test or employment practice "in fact impacts more harshly upon a protected group than upon others." *Griffin v. Board of Regents*, 795 F.2d 1281, 1287 (7th Cir.1986); *see also International Bhd. of Teamsters*, 431 U.S. at 335 n. 15, 97 S.Ct. at 1854 n. 15. Thus, unlike disparate treatment claims, a plaintiff need not prove discriminatory intent. *Id.* Instead, a plaintiff must show "that the policies and practices at issue have a substantially disproportionate impact on the protected class." *Griffin*, 795 F.2d at 1287 (citing *Albemarle Paper Co.*, 422 U.S. at 425, 95 S.Ct. at 2375). Gilty has not made such an initial showing, and his disparate impact claim must therefore fail.

■■■■ As an initial matter, Gilty's complaint appears to be deficient. As a matter of law as well as a matter of common sense, one must first identify a specific employment practice before one can challenge it. *See Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 109 S.Ct. 2115, 2124–25, 104 L.Ed.2d 733 (1989). In Gilty's complaint, however, the disparate impact count states only that "[t]he promotion process utilized by the defendants had a disproportionate and discriminatory impact on all Black candidates for sergeant including the plaintiff."

If we assume that Gilty's complaint has singled out the performance evaluation, then we come to the heart of Gilty's disparate impact woes. Disparate impact cases, because of their emphasis on consequences, necessarily require a focus on statistical evidence. B. SCHLEI & P. GROSSMAN, *supra*, at 1324. Gilty does present what he refers to as "the most basic of statistical proof," the complete absence of black supervisors in Oak Park's police department. The problem, though, is that we have held that underrepresentation statistics cannot make out a prima facie case of disparate impact. *Cox v. City of Chicago*, 868 F.2d 217, 222–23 (7th Cir.1989); *see also Wards Cove*, 109 S.Ct. at 2121–22.[11]

In disparate impact cases, it is eligibility rate, not underrepresentation, that is telling. A plaintiff's statistics should compare the racial composition of the pool of "qualified" applicants to the racial composition of, in this case, the sergeants in the Oak Park Police Department. *See Cox*, 868 F.2d at 222–23; *see also Wards Cove*, 109 S.Ct. at 2121–22. And while those calculations would not diminish the harsh reality of an absence of black supervisors, they would turn our attention to "qualified applicants," a pool that, at its broadest, includes the sixty-six officers requesting a performance evaluation, only five of whom were black. Moreover, only three of the fifty-one officers on the April 6, 1985, eligibility list were black. Those low numbers, in turn, severely impair the usefulness of the statistics that Gilty might have argued had he not used an incorrect analysis. *See, e.g., Soria v. Ozinga Bros.*, 704 F.2d 990, 995 (7th Cir.1983) (rejecting as too small a sample based on sixty-one drivers, of whom

---

In sum, the various machinations necessary for Gilty to show that he might have been promoted appear to us quite substantial and, therefore, unlikely. And while we might be prepared to accept the idea that Gilty raised the inflation/deflation argument below, we are not prepared to accept his argument on blind faith. In response to a valid motion for summary judgment, it is not irrational for us to require Gilty to put forth evidence to support his claim of inflation, especially where, as here, such inflation would likely have to be significant.

At oral argument, we questioned Gilty's assertion of score inflation and asked if the record supported such a factual claim. In response, we were directed to the deposition testimony of a single black officer. That officer complained

that he had received a lower score than a white officer on the performance evaluation even though the black officer had made more arrests and had patrolled outdoors in sub-zero temperatures. That statement, standing alone, does not lead to the inference of wholesale inflation of scores, and is insufficient to allow us to conclude that Gilty might have been promoted even without the Village's alleged discrimination.

11. As we have previously noted, the Court's decision in *Wards Cove* curtailed the scope of disparate impact liability under Title VII. *Village of Bellwood v. Dwivedi*, 895 F.2d 1521, 1533 (7th Cir.1990).

fifteen had been disciplined, including four who were discharged); *see also Washington*, 845 F.2d at 713; *Contreras v. City of Los Angeles*, 656 F.2d 1267, 1273 & n. 4 (9th Cir.1981) ("Statistics are not trustworthy when minor numerical variations produce significant percentage fluctuations."), *cert. denied*, 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 140 (1982).[12]

Even if one assumes that the statistics that we might derive from the record cross that "threshold of reliability" that would allow them to establish a prima facie case, *Allen v. Seidman*, 881 F.2d 375, 378 (7th Cir.1989), Gilty must establish a causal connection between the specific employment practice that he challenges and the disparate impact. *Wards Cove*, 109 S.Ct. at 2124–25 (noting that causation is integral part of plaintiff's case in disparate impact suit). The evidence does not lead to such a connection, however. If one ranks the officers on the eligibility list on the basis of just the written examination and the oral interview (thereby removing the allegedly nonneutral employment practice), then Gilty moves from thirty-third on the list to twentieth. Of the other two black officers on the list, one moves from forty-third to thirty-seventh and the other moves from forty-eighth to forty-ninth. Thus, Gilty cannot connect the performance evaluation to the lack of black sergeants; even without the scores that Gilty considers poisoned with discrimination, not one black officer would have been promoted.

Moreover, Gilty brings this suit as an individual, not on behalf of a class. As such, the foregoing is irrelevant to him unless he can establish that he is a "qualified" black applicant. But as we concluded earlier, Gilty is not "qualified" under the objective *McDonnell Douglas* test, and there is no reason to presume that the definition of "qualified" under *McDonnell Douglas* is any different than the definition of "qualified" under *Cox* and *Wards Cove*. If Gilty is to achieve individual relief, then he must establish that his individual circumstances entitle him to that relief. He cannot rely upon the qualifications of those not before this court to rescue him from the consequences of his own lack of qualification.

## C. *Retaliation*

Gilty's third and final claim topples for roughly the same reason as his disparate treatment and disparate impact claims. For assuming that Gilty has made out a prima facie case, he has failed to show that the Village's proffered explanation was pretextual. Nowhere in Gilty's briefs has he challenged the district court's conclusion, premised in part on the blatantly inconsistent nature of evidence obtained from Gilty himself, that Gilty falsified his academic credentials. Instead, Gilty relies, once again, on an "even if I did" argument.

In essence, Gilty claims that he was unfairly singled out. No one prior to 1988, he argues, had been charged with falsifying academic credentials. Moreover, he argues that subsequent to his being charged a white officer was promoted after being found liable for police brutality.[13] We need not detain ourselves very long in dismissing these arguments.

First, Gilty's present demise came as the result of the Village's comprehensive attempt to verify its officers' credentials. This investigation was made by a police chief who was new to the department and there is little to suggest that he even knew

---

**12.** The district court also rejected Gilty's statistical pool as too small, and as we have previously noted, "especially where statistical evidence is involved, great deference is due the district court's determination of whether the resultant numbers are sufficiently probative of the ultimate fact in issue." *Soria*, 704 F.2d at 994 n. 6; *see also G. Heileman Brewing Co. v. Anheuser-Busch, Inc.*, 873 F.2d 985, 995 (7th Cir.1989).

**13.** Gilty also argues that the chief of police falsified his academic credentials. This argument derives solely from the "affidavits" of Belen and Margaret Zangrilli, but these affidavits were nei-

ther notarized nor made under the penalty of perjury and, therefore, did not comply with rule 56(e) of the Federal Rules of Civil Procedure. As such, we can simply ignore them. *See* 28 U.S.C. § 1746 (permits unsworn declarations only if made "under penalty of perjury" and verified as "true and correct"); *see also Pfeil v. Rogers*, 757 F.2d 850, 859 (7th Cir.1985) (unsworn statement does not meet requirements of FED R.CIV.P. 56(e)) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159 n. 19, 90 S.Ct. 1598, 1609 n. 19, 26 L.Ed.2d 142 (1970)).

about Gilty's discrimination complaint. In all, letters were sent to nineteen officers requesting verification of academic or training credentials. Moreover, the new chief took similar action against the only other person who could not verify his claimed academic credentials—Tom Stec, a white officer.[14] It stretches reason, in the face of this evidence, to find merit in Gilty's argument that the Village investigated, charged, and dismissed him in retaliation for this lawsuit.[15]

Second, Gilty's evidence concerning the officer charged with police brutality is, at best, sparse. We are given no real information as to the circumstances surrounding the charge of brutality, and simply refuse to make wholesale speculations. Gilty, after all, is entitled only to reasonable inferences in his favor. Moreover, an officer who is charged with police brutality does not appear to be similarly situated with one who is charged with falsifying academic credentials. *See Morgan*, 867 F.2d at 1026. Thus, the comparison, even if fully explored, would be of little probative value in light of the obviously more relevant comparison with Stec.

The Village has presented solid and unrebutted evidence that discrimination did not play a role in its decision to investigate, charge, and dismiss Gilty. Indeed, under the circumstances in this record, it was virtually impossible for the Village to have

acted in any other manner. *See Boorstin*, 663 F.2d at 118.

### III.

As the district court noted, if all of Gilty's evidence were true, "a number of black persons would have good cases under the Civil Rights Acts and Title VII." *Gilty, supra.* But Gilty's individual claims cannot rely upon the potentially meritorious claims of others as a substitute for Gilty's own lack of qualification. The judgment of the district court is

AFFIRMED.[16]

---

14. Indeed, Stec was charged prior to Gilty.

15. Gilty's reply brief cites *Wilson v. Pfeiffer*, 31 Fair Emp.Prac.Cas. (BNA) 1154 (S.D.N.Y.1982), in support of his argument that the Village's reason for his termination may be pretextual. In that case, the district judge concluded that the employer's reason for discharging the plaintiff—his falsification of academic credentials and poor working relationship with his supervisor—could have been pretextual. The district court derived this conclusion from evidence suggesting that the plaintiff had received favorable reviews despite his lack of a master's degree, that the plaintiff's certification was not revoked in light of his "outstanding employment record," and that the investigation of the plaintiff's credentials did not begin until the plaintiff protested an allegedly discriminatory evaluation.

The facts in *Wilson* are clearly distinguishable, however. Gilty engaged in a more substantial course of misrepresentation. Moreover,

the Commission's ruling in no way supports Gilty's argument that his misrepresentations were not relevant, even in the face of whatever favorable employment record he may have had; whatever the relevance of lying in *Wilson*, it is clear that lying is relevant in this case. Last, Kohnke uncovered Gilty's fraud after a comprehensive investigation as opposed to one that was apparently individualistic in nature, and treated both Stec and Gilty in exactly the same manner.

16. Our analysis of the Village's motion for sanctions reveals that many, if not all, of the objections concerning Gilty's reply brief are to minor technical flaws. Under these circumstances, we decline to award sanctions. Gilty's statements are hardly worthy of praise, but neither do they rise to such a level of grievousness as to merit our invocation of 28 U.S.C. § 1927 or FED.R. APP.P. 46(c). Moreover, while Gilty's appeal may lack merit, we do not believe that it was completely frivolous within the meaning of FED. R.APP.P. 38.