Beverly DIXON, et al., Plaintiffs,

v.

Jeremy D. MARGOLIS, Director of the Department of State Police, et al., Defendants.

No. 89 C 5019.

United States District Court, N.D. Illinois, E.D.

May 16, 1991.

Mary Lee Leahy, Leahy Law Offices, Springfield, Ill., Michael R. Berz, Kankakee, Ill., Wayne Giampietro, Witwer Burlage Poltrock & Giampietro, Chicago, Ill., for plaintiffs.

Paula Giroux, Asst. Atty. Gen., Office of Atty. Gen., Chicago, for defendants.

MEMORANDUM OPINION AND ORDER

HART, District Judge.

This case is a class action in which it is alleged that defendants discriminated against blacks in promotions within the Illinois State Police ("ISP"). Plaintiffs are black troopers, special agents, sergeants, and special agent sergeants employed by ISP. Four categories of promotions are involved in this case: (a) trooper to sergeant; (b) sergeant to master sergeant; (c) special agent to special agent sergeant; and (d) special agent sergeant to special agent master sergeant. These promotions

are all to supervisory positions. Troopers, sergeants, and master sergeants work in ISP's Division of State Troopers ("DST"). Special agents, special agent sergeants, and special agent master sergeants work in ISP's Division of Criminal Investigation ("DCI"). Defendants are Jeremy Margolis, former Director of ISP; William O'Sullivan, Deputy Director in charge of DST; Ronald Grimming, Deputy Director in charge of DCI; Gene Marlin, Deputy Director in charge of the Division of Administration; Ernest Neuman, Deputy Director in charge of the Division of Training; David Williams, Deputy Director in charge of the Division of Internal Investigations; Lawrence Scheufele, Deputy Director in charge of the Division of Forensic Services and Identification; and Harry Orr, John Rednour, Fred Inbau, David Schippers, and Richard Mitchell, members of the State Police Merit Board (the "Merit Board").[1] The defendants are sued in both their individual and official capacities.[2] Presently pending is defendants' motion for summary judgment.

This suit is brought as a violation of the equal protection clause of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983. No claim is made under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* Plaintiffs seek both injunctive and compensatory relief. The Eleventh Amendment limits the monetary claims to those against defendants in their individual capacities only. *Santiago v. Lane,* 894 F.2d 218, 220 n. 3 (7th Cir.1990). Since this claim is under § 1983, plaintiffs are required to show discriminatory intent. *Riordan v. Kempiners,* 831 F.2d 690, 695–96 (7th Cir.1987); *David K. v. Lane,* 839 F.2d 1265, 1271 (7th Cir.1988). This case does not involve a Title VII claim in which disparate impact without discriminatory intent can constitute a cause of action. *See Riordan,* 831 F.2d at 696; *Gilty v. Village of Oak Park,* 919 F.2d 1247, 1254 (7th

Cir.1990); *Allen v. Seidman,* 881 F.2d 375 (7th Cir.1989).

Surprisingly, the primary focus of the parties' arguments are on the question of whether there is sufficient proof of a disparate impact as defined by regulations applicable to Title VII. Although not fully expounded, plaintiff's argument would seem to be that an inference of discriminatory intent can be drawn from evidence of a disparate impact, defendants' knowledge of that disparity, and other factors. *See generally Washington v. Davis,* 426 U.S. 229, 241–42, 96 S.Ct. 2040, 2048–49, 48 L.Ed.2d 597 (1976) (discriminatory impact alone does not show discriminatory intent, but it is a relevant factor to be considered along with the totality of relevant facts); *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 264–68, 97 S.Ct. 555, 562–65, 50 L.Ed.2d 450 (1976) (same). *See also International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 339–40 & n. 20, 97 S.Ct. 1843, 1856–57 & n. 20, 52 L.Ed.2d 396 (1977) (statistical evidence, particularly evidence of a substantial disparity, is an important factor to consider, but is not irrefutable and its usefulness depends on all the surrounding facts and circumstances). In a class action such as the present case, "plaintiffs' *prima facie* case will thus usually consist of statistical evidence demonstrating disparities in the application of employment actions as to minorities ..., buttressed by evidence of general policies or specific instances of discrimination." *Coates v. Johnson & Johnson,* 756 F.2d 524, 532 (7th Cir.1985). *Accord EEOC v. Sears, Roebuck & Co.,* 839 F.2d 302, 308 (7th Cir.1988).

On a motion for summary judgment, the entire record is considered with all reasonable inferences drawn in favor of the nonmovant and all factual disputes resolved in favor of the nonmovant. *Oxman v. WLS–TV,* 846 F.2d 448, 452 (7th Cir.

---

**1.** The defendants who are not members of the Merit Board will be referred to as the ISP defendants.

**2.** Since Margolis is no longer ISP's Director, he can no longer be considered as being sued in his

official capacity. It is, however, unnecessary to substitute in the current Director since the state is already in this case in that the other defendants are sued in their official capacities.

1988); *Jakubiec v. Cities Service Co.*, 844 F.2d 470, 471 (7th Cir.1988). The burden of establishing a lack of any genuine issue of material fact rests on the movant. *Id.* at 473. The nonmovant, however, must make a showing sufficient to establish an essential element for which it will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In such instances, the movant need not provide affidavits or deposition testimony showing the nonexistence of these essential elements. *Id.* at 324, 106 S.Ct. at 2553. Also, it is not sufficient to show evidence of purportedly disputed facts if those facts are not plausible in light of the entire record. *Collins v. Associated Pathologists, Ltd.*, 844 F.2d 473, 476–77 (7th Cir.), *cert. denied*, 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 110 (1988). In this case, the parties are largely in agreement as to the underlying facts. The parties, though, disagree as to what reasonable inferences can be drawn from these facts. To a large degree, the parties' disagreement is represented by the varying conclusions each party's expert draws from the available statistics and other information. The first issue to resolve is plaintiffs' challenge to defendants' expert.

Pursuant to Fed.R.Civ.P. 37(d), plaintiffs move to bar defendants' expert, Frank Landy, on the ground that he relied on data that was not provided to plaintiffs. Plaintiffs' motion was initially presented on November 30, 1990, the date the parties pretrial order was filed. Plaintiffs contended that the failure to provide all the data was inconsistent with prior discovery requests. Plaintiffs do not make any representation that they complied with Local Rule 12(k).[3] Defendants responded to the motion on December 14. They conceded that they failed to provide certain information to plaintiffs that Landy had in his possession, but represented that it was an oversight that was corrected as soon as plaintiffs pointed it out. Defendants stated that other discrepancies in the data are based on Landy developing further data from the same basic documents that were given to plaintiffs. On April 5, 1991, plaintiffs filed a brief in support of their motion, contending there were still some missing documents and that they incurred certain additional expenses due to their expert having to duplicate some of his prior work. Plaintiffs still seek to bar defendants' expert. Defendants responded again, making the same representations as were in their initial response and further representing that all documents that they had have been provided to defendants.

■ The representations of defendants' counsel are accepted as true. It is found that all documents have now been provided and that the initial failure to provide all documents was inadvertent. Plaintiffs fail to show that they would suffer any additional prejudice if Landy were permitted to testify. Therefore, the only proper sanction would be reimbursement for the additional charges of plaintiffs' expert that were incurred because the new documents had to be examined and some prior conclusions reconsidered. Defendants contend it was not a reasonable expense to have plaintiffs' expert recheck his data, but this precise suggestion was contained in defendants' initial response to the motion. That expense will be reimbursed. Plaintiffs are entitled to receive sanctions in the amount of $1,435.00.

■ Plaintiffs also seek their fees and costs for pursuing this motion. Plaintiffs, however, never sought to informally resolve this matter with defendants. Defendants' responses indicate that such an approach may have been successful. Also, plaintiffs did not succeed at having the expert barred. Furthermore, other than documenting the additional expenses, the

---

**3.** To curtail undue delay and expense in the administration of justice, this court shall hereafter refuse to hear any and all motions for discovery and production of documents under Rules 26 through 37 of the Federal Rules of Civil Procedure, unless the motion includes a statement (1) that after personal consultation

and sincere attempts to resolve differences they are unable to reach an accord, or (2) counsel's attempts to engage in such personal consultation were unsuccessful due to no fault of counsel's....

N.D.Ill. Local Rule 12(k).

April 5 filing was largely unnecessary and did not produce any additional success. Each party shall bear its own fees, costs, and expenses in pursuing and opposing this motion.

This case involves four categories of promotions. Since ISP keeps promotion lists in effect for 18 months, the case also involves three promotion lists for each category. The "1985 List" was in effect from December 1, 1985 to June 1, 1987; the "1987 List" from June 1, 1987 to December 1, 1988; and the "1988 List" from December 1, 1988 to June 1, 1990. Subsequent to June 1, 1990, ISP used a new promotional test and procedure that is not being challenged. Throughout the 1985-to-1990 period covered by this litigation, the same procedures were used.

Rankings on each promotion list were determined by applying three factors. An applicant's score on a written examination was 50% of the total score. A performance evaluation known as BARS, Behavior Anchored Rating Scale, made up 45% of the total score. The other 5% of the total score was based on seniority. The Merit Board ranked applicants for each of 23 DST Districts and for each of 4 DCI Areas. Applicants were only considered for the District or Area in which they were already employed. The top 65% of each list was certified for promotion by the Merit Board. The top ten persons on each list were found to be equally qualified and eligible for promotion. Each time an opening occurred, one of these ten persons was chosen and the next person on the certified list would be added to the list of ten eligible candidates.

The Merit Board has exclusive responsibility for creating, administering, and evaluating the written examinations. The Merit Board contracted with McCann Associates, a private consulting firm, to create the written examinations. The written examinations consisted entirely of multiple choice questions. Employees of ISP administered the examinations, but McCann graded and scored them. ISP was exclusively responsible for designing and administering BARS. Once the scores were determined, ISP would forward the BARS scores to the Merit Board.

It is uncontested that ISP has an affirmative action program for new employees under which it aims to hire 50% white males and 50% minorities or females.[4] This program apparently was implemented following a lawsuit filed in 1975 and a subsequent settlement with the EEOC that mooted that lawsuit. *See Washington v. Walker*, 529 F.2d 1062, 1064 (7th Cir.1976); *Washington v. Walker*, 734 F.2d 1237 (7th Cir.1984). This program is for hiring new officers, not for the promotions that are the subject of the present lawsuit. Under the affirmative action hiring program, separate lists are kept for white males, "black males and other racial minorities," and females. Each list has a cutoff based on a written entrance examination and physical. Persons below the cutoff will not be hired. The cutoff score for black candidates is lower than for white candidates.[5]

Plaintiffs contend that the written examinations and the process of selecting from the ten highest candidates is the source of discrimination. They do not contend the BARS or the 5% weight accorded seniority is a source of discrimination. Defendants' expert concludes that the statistical evidence shows no adverse impact, whereas plaintiffs' expert reaches a contrary conclusion. On defendants' motion for summary judgment, this dispute must be resolved in favor of plaintiffs unless the opinion of plaintiffs' expert cannot possibly be accepted by a reasonable trier of fact because so lacking in acceptable analysis as to be incredible or because the conclusions are based on facts not supported by the evidence before the court.

The parties' briefs as well as the reports of the experts focus on whether the promotional examinations had an adverse im-

---

**4.** It is not stated whether these goals are actually achieved.

**5.** It is unclear if black females are only included in the female category or if they are also included in the minority category. It is also unstated as to whether females have a lower cutoff score.

pact on blacks as that term is used under Title VII. Thus, the parties have used the "four-fifths" or "80%" rule of thumb in evaluating whether there is an adverse impact. *See* 29 C.F.R. § 1607.4(D); *Adoption of Questions and Answers to Clarify & Provide a Common Interpretation of the Uniform Guidelines on Employee Selection Procedures,* 44 Fed.Reg. 11996, 11998 (1979) (*"Questions & Answers"*). As stated in *Questions & Answers* (which is what the parties rely upon, not the regulations themselves), "This '4/5ths' or '80%' rule of thumb is not intended as a legal definition, but is a practical means of keeping the attention of the enforcement agencies on serious discrepancies in rates of hiring, promotion and other selection decisions." *Id.* at 11998. The regulations provide:

A selection rate for any race, sex, or ethnic group which is less than four-fifths (4/5) (or eighty percent) of the rate for the group with the highest rate will generally be regarded by the Federal enforcement agencies as evidence of adverse impact. Smaller differences in selection rate may nevertheless constitute adverse impact, where they are significant in both statistical and practical terms or where a user's actions have discouraged applicants disproportionately on grounds of race, sex, or ethnic group. Greater differences in selection rate may not constitute adverse impact where the differences are based on small numbers and are not statistically significant, or where special recruiting or other programs cause the pool of minority or female candidates to be atypical of the normal pool of applicants from that group.

29 C.F.R. § 1607.4(D). These regulations deal only with adverse impact; they do not concern the issue of intentional discrimination. Failing the "80%" rule of the regulations would be a showing of a substantial disparity, but that showing of adverse impact must be considered along with the other circumstances of the case in determining whether there is sufficient evidence from which it can be inferred that defendants intentionally discriminated.

Combining together all four promotion categories for all three test periods, 6.77% of black applicants were promoted whereas 14.21% of white applicants were promoted.[6] Thus, blacks were promoted at 47.6% of the rate that whites were promoted. Landy, defendants' expert, analyzes each category of test and each test period separately. Out of the 12 different situations, he finds only three situations where there was an adverse impact on blacks: 1985 Special Agent Sergeants; 1987 Special Agent Sergeants; and 1987 Sergeants. In five of the nine situations where he found no adverse impact, however, Landy had to adjust the figures to find no adverse impact. For all 12 situations, Landy added two to the number of blacks promoted and subtracted two from the number of whites promoted. For example, from the 1988 Master Sergeant List, 2 out of 20 blacks were promoted and 43 out of 198 whites were promoted. Thus, 10% of black applicants were promoted and 21.72% of white applicants were promoted meaning blacks were promoted at 46.05% of the rate for whites. Landy adjusted these figures to produce the result that 20% of blacks (4/20) and 20.71% of whites (41/198) were promoted for a ratio of 96.59%. The purpose of the adjustment is to weed out statistically insignificant disparities. The statistics, however, are made statistically insignificant by breaking them down into a number of categories. *Compare Washington v. Electrical Joint Apprenticeship & Training Committee of Northern Indiana,* 845 F.2d 710, 713 (7th Cir.), *cert. denied,* 488 U.S. 944, 109 S.Ct. 371, 102 L.Ed.2d 360 (1988) ("it is an unacceptable statistical procedure to turn a large sample into a small one by arbitrarily excluding observations"). While making these breakdowns in this case may be appropriate given that different promotion categories and periods of time are involved, the overall statistics should be considered

---

**6.** This figure is derived by totaling the figures for each column in Table 1 of Landy's November 7, 1990 report. Out of 443 black applicants, 30 were promoted. Out of 2610 white applicants, 371 were promoted.

as well[7] in determining if there is a significant disparity.[8] This is not to say that Landy's conclusions are incorrect. All that is being said is that his conclusions are subject to dispute and that, in light of the conclusions of plaintiffs' expert that are discussed below, a factual dispute remains that will have to be resolved by the trier of fact.

Plaintiffs' expert, Charles Hobson, analyzed the data in four categories.[9] He combined all three periods for each of the four promotion categories. He could not directly draw any conclusions as to special agent master sergeant because of the small size of the sample in that category. Totaling the numbers for the three periods, 5.3% of black applicants were promoted to sergeant, which is 58.9% of the 9.0% rate at which white applicants were promoted. Black applicants for special agent sergeant were promoted 4.2% of the time, which is 20.3% of the white applicants' rate of 20.7%. Black applicants for master sergeant were promoted 16.3% of the time, which is 83.6% of the white applicants' rate of 19.5%. Hobson notes that the master sergeant promotion rate for black applicants was higher than that for whites in 1985 and 1987, but in 1988 only 10.1% of black applicants were promoted while 21.1% of white applicants were promoted.[10]

■ Neither Landy nor Hobson limit their analyses to the above figures. Besides considering other promotion rate breakdowns, they also consider issues beyond just adverse impact. Hobson also provides analysis for linking blacks' lower examination scores to their lower selection rate. For purposes of ruling on the summary judgment motion, it is sufficient to conclude that the trier of fact could accept Hobson's opinion that the promotional examinations had an adverse impact on blacks. This creates a factual dispute for trial as to the three categories of promotion discussed by Hobson. Since no evidence is presented supporting a disparate impact as to promotions to special agent master sergeants,[11] the claims of that subclass will be dismissed.

Plaintiffs also contend they were adversely impacted by the process of selecting from the ten highest candidates. There is evidence that no expressly defined criteria was applied in making these selections. While the director of ISP had to formally approve the promotions, he simply accepted the decisions of senior supervisors who made the actual decision. While Hobson criticizes the lack of criteria, especially in light of the fact that all the decisionmakers were white, neither Hobson nor plaintiffs' opposition to summary judgment point to any statistical information regarding the rate at which whites and blacks were selected once they reached the 10–person eligibility list. Absent any such supporting evidence, there is an insufficient basis for concluding that the last step of the selection process was a source of discrimination. Plaintiffs' claims will be limited to a claim that defendants intentionally discriminated

---

7. "Where the user's evidence concerning the impact of a selection procedure indicates adverse impact but is based upon numbers which are too small to be reliable, evidence concerning the impact of the procedure over a longer period of time and/or evidence concerning the impact which the selection procedure had when used in the same manner in similar circumstances elsewhere may be considered in determining adverse impact." 29 C.F.R. § 1607.4(D).

8. Of course, it must be kept in mind that statistical significance does not, by itself, show that there is a significant causal relationship between the variables. An explanatory theory and consideration of the surrounding facts is necessary to determine if there is a causal relationship. *See Tagatz v. Marquette University,* 861 F.2d 1040, 1045 (7th Cir.1988).

9. There are some small disparities as to the basic data used by Hobson and Landy.

10. The EEOC's "80%" rule is not controlling in the present case. The 83.6% rate and the more recent results are sufficient to raise a factual dispute as to adverse impact.

11. Hobson does not discuss this promotional category because of the limited data available. Table 1 of Landy's report shows that, totaling the three periods, 25% of black applicants (3/12) were promoted and 20.9% of white applicants (50/239) were promoted. Blacks were promoted at a higher rate from the 1988 List and the 1987 List. On the 1985 List, there were only two black applicants and neither of them were promoted.

against them through use of the qualifying examinations.[12]

Plaintiffs point to additional evidence which, considered along with the evidence of adverse impact, would be sufficient for the trier of fact to draw the inference that at least some of the defendants intentionally discriminated against blacks. Each year defendants received an affirmative action report drafted by ISP's affirmative action officer. These reports indicated that blacks were being promoted to supervisory positions at a lower rate than whites and that the qualifying examinations were a likely cause of this discrepancy.[13] There is also evidence that members of the Merit Board believed the tests were discriminatory. Nevertheless, the Merit Board continued to use the tests and never requested that McCann provide information as to whether the tests were validly related to job performance.[14] A trier of fact could infer from this evidence and the adverse impact evidence that defendants continued to use the tests as a means of intentionally discriminating against blacks. That is not a necessary inference to draw, but it is a possible and reasonable one and therefore is a sufficient basis for finding there to be a disputed factual issue as to defendants' discriminatory intent.[15]

The ISP defendants also argue that, to the extent sufficient evidence of discriminatory intent is presented, it cannot be attributed to them. In the pretrial order, plaintiffs agreed that it was an uncontested fact that the Merit Board "was responsible for the written examination portion of the promotion process." In support of their motion for summary judgment, defendants filed their statement of facts as to which there is no genuine issue of material fact. *See* N.D.Ill. Local Rules 12(m), 12(n). In their response to this statement, plaintiffs agreed that "The Merit Board has the *exclusive* responsibility for selecting, administering and evaluating the written examination." (Emphasis added.) Given this undisputed fact, it cannot be inferred from the discriminatory impact of the test that the ISP defendants had a discriminatory intent. That inference can only be drawn as to the members of the Merit Board. Since there is no other sufficient evidence of the ISP defendants' discriminatory intent, the claims against those defendants will be dismissed.

IT IS THEREFORE ORDERED that:

(1) Plaintiffs' motion to bar expert witness and for sanctions is granted in part and denied in part. Defendants' expert

---

**12.** This holding should not be understood as incorporating the holding in *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989). Contrary to defendants' reliance on *Wards Cove*, plaintiffs' claim in the present case is one for disparate treatment, not a disparate impact case as in *Wards Cove*. Compare *Gilty*, 919 F.2d at 1250–53 (discussing Gilty's disparate treatment claim without a single citation to *Wards Cove* ) with *Gilty*, 919 F.2d at 1254–55 (discussing Gilty's disparate impact claim). While disparate impact, the perceived validity of the qualifying examinations, and the reasons for using the qualifying examinations will apparently be relevant to the question of defendants' discriminatory intent, the ultimate focus of the present case should be on defendants' intent, not merely on the appropriateness of using the examinations.

**13.** Even though these reports were based on limited statistical analysis that might not be acceptable to the experts in this case, the reports are still evidence of what defendants would have believed the situation was and thus are highly relevant to the question of defendants' motives.

**14.** Again, that Landy now finds the examinations to be valid, job-related examinations (a disputed fact in light of Hobson's conclusions) is irrelevant to the question of defendants' motives and beliefs at the time the examinations were being used.

**15.** Defendants also argue that the affirmative action program for hiring troopers and special agents distorts the pool of applicants for promotions and thus explains away any adverse impact that may exist. *See* 29 C.F.R. § 1607.4(D). In other words, they argue that the racial disparity in promotions is caused by a hiring process that favors blacks and therefore cannot be considered evidence of discriminatory motive. While the pool of applicants is a relevant factor to consider, defendants have not presented evidence from which it could only be concluded that the affirmative action program was the cause of the disparity. Therefore, a factual dispute remains as to defendants' discriminatory intent.

witness will not be barred from testifying. Defendants shall pay plaintiffs $1,435.00 as sanctions, which represents plaintiffs duplicative expenses incurred as a result of defendants' inadvertent discovery omissions. Each party shall bear its own fees and costs related to this motion.

(2) Defendants' motion for summary judgment is granted in part and denied in part. The claims as to promotion from special agent sergeant to special agent master sergeant are dismissed, including the claim of named plaintiff William Haley. Defendants Jeremy Margolis, William O'Sullivan, Ronald Grimming, Gene Marlin, Ernest Neuman, David Williams, and Lawrence Scheufele are dismissed from this case.