

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-1-1994

# Mardell v. Harleysville Life Ins. Co.

Precedential or Non-Precedential:

Docket 91-0149

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

Recommended Citation

"Mardell v. Harleysville Life Ins. Co." (1994). *1994 Decisions.* Paper 97.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/97

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 93-3258
_____


NANCY MARDELL,

Appellant

v.

HARLEYSVILLE LIFE INSURANCE COMPANY,
a Pennsylvania Corporation

_____

On Appeal From the United States District Court
for the Western District of Pennsylvania
(D.C. Civil No. 91-01493)

_____


Argued:  December 9, 1993

Before:  BECKER, NYGAARD, Circuit Judges,
and YOHN, District Judge[0]

(Filed August 2, 1994)

<div style="margin-left:40%">

JOEL S. SANSONE (Argued)
KELLY L. SCANLON
Sansone & Associates
220 Lawyers Building
428 Forbes Avenue
Pittsburgh, PA  15219
Attorneys for Appellant


ROSLYN M. LITMAN (Argued)
MARTHA S. HELMREICH
Litman Litman Harris Brown
and Watzman, P.C.
3600 One Oxford Centre
Pittsburgh, PA  15219

</div>

_____

[0]The Honorable William H. Yohn, Jr., United States District Judge
for the Eastern District of Pennsylvania, sitting by designation.

                                 Attorneys for Appellee


                         JAMES R. NEELY, JR.
                         Deputy General Counsel
                         GWENDOLYN YOUNG REAMS
                         Associate General Counsel
                         LORRAINE C. DAVIS
                         Assistant General Counsel
                         BARBARA L. SLOAN (Argued)
                         Equal Employment Opportunity
                            Commission
                         Office of General Counsel
                         1801 L Street, NW
                         Washington, DC  20507
                                 Attorneys for Amicus
                                 Curiae in Support of
                                 Appellant


  _____

                **OPINION OF THE COURT**
  _____



BECKER, Circuit Judge.

Nancy Mardell appeals from the grant of summary judgment for defendant Harleysville Life Insurance Company ("Harleysville") by the District Court for the Western District of Pennsylvania in an employment discrimination suit alleging age and gender discrimination. Mardell brought several claims pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C.A. §§ 2000e to 2000e-17 (1981 & Supp. 1994), the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C.A. §§ 621-34 (1985 & Supp. 1994), and the Pennsylvania Human Relations Act, 43 PA. CONS. STAT. ANN. §§ 951-63 (1991 & Supp. 1994). The district court relied upon the rule pioneered by the Tenth

2

Circuit Court of Appeals in <u>Summers v. State Farm Mutual Automobile Insurance Co.</u>, 864 F.2d 700 (10th Cir. 1988) to hold that Harleysville's "after-acquired evidence" of Mardell's alleged résumé fraud provided a complete defense to Mardell's causes of action. "After-acquired evidence" in an employment discrimination case denotes evidence of the employee's or applicant's misconduct or dishonesty which the employer did not know about at the time it acted adversely to the employee or applicant, but which it discovered at some point prior to or, more typically, during, subsequent legal proceedings; the employer then tries to capitalize on that evidence to diminish or preclude entirely its liability for otherwise unlawful employment discrimination.

We reject the <u>Summers</u> rule in favor of one circumscribing the use of after-acquired evidence to the remedies phase of an employment discrimination suit brought pursuant to Title VII or ADEA.[0] We will therefore reverse the district court's order granting summary judgment to Harleysville, and

---

[0]Throughout the following discussion we will generally treat claims arising under Title VII and ADEA similarly insofar as no party has given us reason to distinguish between them for purposes of the principal issue before us, and we have thought of no reason for doing so ourselves. <u>See</u>, <u>e.g.</u>, <u>Trans World Airlines, Inc. v. Thurston</u>, 469 U.S. 111, 121, 105 S. Ct. 613, 621 (1985) (applying Title VII precedent to ADEA because "the substantive [(but not the procedural or remedial)] provisions of ADEA `were derived <u>in haec verba</u> from Title VII'" (quoting <u>Lorillard, Div. of Loew's Theatres, Inc. v. Pons</u>, 434 U.S. 575, 584, 98 S. Ct. 866, 872 (1978)); <u>Armbruster v. Unisys Corp.</u>, No. 93-1333, Mem. op. at 20 n.10 (July ??, 1994); <u>Miller v. Cigna Corp.</u>, No. 93-1773, 1994 WL 283269, at *4, *12 n.7 (June 28, 1994); <u>Smithers v. Bailar</u>, 629 F.2d 892, 894-95 (3d Cir. 1980) (applying Title VII's framework to an ADEA claim).

3

remand the case for further proceedings consistent with this opinion.

I.  FACTS AND PROCEDURAL HISTORY[0]

Harleysville hired Mardell as a Branch Life Manager in February 1988 to manage insurance agents.[0]  Mardell appears from the record to have been an accomplished life insurance agent.  (A 57.) Before accepting the position with Harleysville, Mardell had been employed by Prudential Life Insurance Company ("Prudential") for eleven years.  (A 58, 66, 68.)  William Shelow, who was being promoted out of the position at Harleysville for which Mardell would be hired, had approached Mardell at Prudential about replacing him in his soon-to-be vacated position.  (A 69.) Shelow was familiar with Mardell's work at Prudential and felt that she would excel as a Life Manager for Harleysville.  (A 70.)

In December 1989, Mardell became the first Harleysville employee ever to be placed on probation.  William Forloine,

_____

[0]For purposes of Harleysville's summary judgment motion, we view the facts in the light most advantageous to Mardell, and resolve all disputed issues of fact in her favor.
Inasmuch as some of the facts pertaining to Mardell's prima facie case of discrimination and to the immateriality of her misrepresentations are drawn from portions of Mardell's and others' depositions that Mardell did not make part of the record in the district court but submitted in her appendix to her brief to this Court, we as a court of review may not consider them for substantive purposes.  See FED. R. APP. P. 10(a), 30(a); Jaconski v. Avisun Corp., 359 F.2d 931, 936 & n.11 (3d Cir. 1966); Reed v. Amax Coal Co., 971 F.2d 1295, 1299 n.3 (7th Cir. 1992).  We mention that testimony just as informative background to flesh out the particulars of the dispute; we do not consider it on the merits.
[0]During Mardell's tenure the job title was reclassified as a Regional Director.

4

Mardell's direct supervisor and Harleysville's senior vice-president of marketing and sales, avowedly effected this action for poor performance, even though at the time he imposed the probation Mardell's work was improving and she had surpassed the yearly goal he had set for her (A 76-78; SA 94, 99, 165-66). The terms of probation required Mardell to meet or exceed her quota every month at pain of dismissal, a requirement not imposed on any of her male peers or supervisors and one which set a standard that most of Harleysville's managers commonly failed to fulfill (A 76-77, 80, 133-34; SA 166).

In February 1990, Harleysville discharged Mardell, who then was 52 years old. (A 15, 59.) Four months later Harleysville hired a 40 year old male to replace her. (A 131-32.) Harleysville attributed its termination decision to Mardell's poor work performance. Specifically, Harleysville contends that during Mardell's tenure, sales declined in her region, as did the number of independent insurance agents with whom she maintained ongoing contact. The company also faulted her for improperly implementing its new marketing plan, failing to learn to use its new computer system effectively, making poor presentations, and being unable to work suitably with some co-workers and outside agents (SA 164-66).

Mardell disputes Harleysville's asserted reasons for its decision to discharge her, contending instead that gender and/or age discrimination was the cause. Mardell combined the aforementioned circumstantial evidence of disparate treatment (having been the only person placed on probation and subjected to

5

a quota, and having been replaced by a younger man) with direct evidence of her supervisor's comments and attitudes indicative of sex and/or age bias. She testified that Forloine had told her that as a female he had higher expectations of her; that she "wasn't one of the boys" and "couldn't be a good old boy;" that he did not think her position "was a job for a woman;" and that many of her agents would think of her "as a wife." She testified further that once he had accused her, without foundation, of missing work because she "just wanted to stay home and watch the soaps," and that she had become aware of a meeting before all the company's vice presidents and regional directors held after her termination at which he allegedly stated that he "would never have another female regional director." (A 71, 73-75.) She added that he had frequently mentioned her age and that he had told her once that she "should be home playing with [her] grandchildren." (A 73.)

During discovery in the instant case, Harleysville unearthed several instances of employment application and résumé misrepresentation committed by Mardell. First, Mardell represented that she had obtained a Bachelor of Science degree from the University of Pittsburgh, whereas in fact the university had never issued a diploma to her: the university's records indicate that she has yet to complete all her work in two related courses required for her degree. (A 82-84.) Mardell attributed her misrepresentation to a mistaken belief that she had earned a Bachelor of Science degree. She explained that she had belatedly completed and submitted all required work for those two courses

6

and had been informed by her professor that he would file a grade change report, but that for some unknown reason the university's official records never credited the supposed report. (A 84, 96-100.) Notably, Harleysville apparently did not consider the possession of a college degree a prerequisite to employment as a Branch Life Manager, and was prepared to hire the "mental equivalent" of a college graduate. (A 123.)

Second, Harleysville learned that Mardell had also misrepresented her professional experience on both her employment application and résumé. Mardell had listed in the "employment history" section of the application form and the "professional experience" section of her résumé that she had served as a "writer-interviewer" at a local hospital, as a therapist at a mental health center, and as a manager and public relations director at a hotel. (A 58.) Although Mardell had performed most of those tasks as she described them on those documents (A 60-64, 67-68, 84-90, 104-05), in both documents she had (at a few points greatly) exaggerated some of her specific duties (A 63, 67-68, 104; SA 131-32); misrepresented that the hospital and mental health care center positions were remunerated (in fact she took them on as unpaid field course work to earn college credit) (A 61-62, 85, 89-90); and misstated the dates she had performed those activities (A 58, 90; SA 121, 145).

Buoyed by its admittedly post-termination discoveries, Harleysville moved for summary judgment. It attached to its motion affidavits by Glyn Mangum, the vice-president of sales who had made the decision to hire Mardell, and Forloine. Mangum

7

averred that he had relied on Mardell's application and résumé when considering her for the Branch Life Manager position and that, had he known of her misrepresentations, he would not have hired her.  (SA 84-85, 87.)  Forloine averred that he had considered Mardell's alleged college degree to be a "plus" when he interviewed her for the position; that, had he known of her misrepresentations at the time of her interview, he would have "strongly recommended that she not be hired;" and that, had he at any time apprehended her misrepresentations, he would have, consistent with Harleysville's policy as declared by the employment application form Mardell had completed, "terminated her immediately."  He added that, in context of what Harleysville now knows to be true about Mardell, it would not voluntarily reemploy her (SA 95, 99).

Basing its summary judgment motion on the after-acquired evidence doctrine, Harleysville assumed <u>arguendo</u> that it had impermissibly discriminated against Mardell, but essentially contested Mardell's standing to sue and, in the alternative, questioned whether she had realized an injury (SA 61-71).  On April 27, 1993, the district court entered its Memorandum and Order granting Harleysville's motion (A 5).  In the process, it applied a variant of the <u>Summers</u> rationale adapted to résumé fraud cases and held that, because of her fraud in gaining her employment, Mardell had suffered no legally cognizable injury even if Harleysville had willfully discriminated against her on the basis of her age and/or sex.  Given that disposition, the court did not reach the question whether Mardell had made out a

8

prima facie case of sex and/or age discrimination.  This appeal

followed (A 5).[0]


## II.  THE RELEVANT LEGAL BACKGROUND

### A.  General Background

Experience with the federal employment discrimination

laws has culminated in the division of disparate treatment suits

into three classes:  pure discrimination, pretext, and mixed-

motives cases.[0] McDonnell Douglas Corp. v. Green, 411 U.S. 792,

93 S. Ct. 1817 (1973), as embellished by Texas Department of

Community Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089

(1981) and St. Mary's Honor Center v. Hicks, 113 S. Ct. 2742

(1993), establishes a flexible three-part model to allocate the

shifting burdens of production in the first two classes of

individual disparate treatment cases (pure discrimination and

pretext).  Price Waterhouse v. Hopkins, 490 U.S. 228, 109 S. Ct.

---

[0]We exercise plenary review over the district court's grant of
summary judgment, and employ the same standard applicable in the
district court. Davis v. Portline Transportes Maritime
Internacional, 16 F.3d 532, 536 (3d Cir. 1994).  We affirm a
grant of summary judgment if "`there is no genuine issue as to
any material fact and . . . the moving party is entitled to
judgment as a matter of law.'"  Id. at 536 n.3 (quoting FED. R.
CIV. P. 56(c)).
      The facts of this case transpired before the effective
date of the Civil Rights Act of 1991 (the "1991 Act"), Pub. L.
No. 101-166, 105 Stat. 1075 (1991).  Hence, the substantive and
remedial changes made by the 1991 Act do not apply to this case,
see Landgraf v. USI Film Prods., 114 S. Ct. 1483, 1505-06 (1994),
but occasionally we will make references to them and the
accompanying legislative history because that material is
generally informative.
[0]For purposes of this opinion, we ignore the disparate impact
theory of employer liability.

1775 (1989) supplies the procedure for proving intentional discrimination in mixed-motives cases.  Numerous opinions of this Court have explained the evidentiary regimes that the McDonnell Douglas/Burdine/Hicks line of cases and Price Waterhouse have established, but for the benefit of the untutored reader we summarize them in the margin.[0]

---

[0]In a case of failure to hire or promote, the plaintiff first

> must carry the initial burden under the statute of establishing a prima facie case of [unlawful] discrimination. This may be done by showing (i) that he belongs to a [protected category]; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

McDonnell Douglas, 411 U.S. at 802, 93 S. Ct. at 1824.  If the plaintiff succeeds, the burden of production transfers to the defendant to "articulate some legitimate, nondiscriminatory reason for the employee's rejection." Id.  In the unlikely event that the employer at this juncture remains silent, the case falls within the set of "pure discrimination" cases and "the court must enter judgment for the plaintiff." Burdine, 450 U.S. at 254, 101 S. Ct. at 1094.
　　If the defendant does introduce into evidence a legitimate reason for its actions, the case becomes a "pretext" case.  In that event the employer need not prove that the tendered reason actually motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination rests at all times with the plaintiff. See id. at 253, 254, 256, 101 S. Ct. at 1093, 1094, 1095.  Once the employer answers its relatively light burden by articulating a legitimate reason for the unfavorable employment decision, the burden of production rebounds to the plaintiff, who must now show by a preponderance of the evidence that the employer's explanation is pretextual.
　　To accomplish this, the plaintiff must convince the factfinder "both that the reason was false, and that discrimination was the real reason."  Hicks, 113 S. Ct. at 2752; see id. at 2754 ("It is not

10

yenough . . . to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination." (emphasis in original)).  In other words, since the plaintiff's making out a prima facie case only shifts the burden of production to the employer, the employer need only articulate some legitimate reason for its action to meet the plaintiff's serve.  The factfinder's rejection of that proffered legitimate reason permits, but does not compel, a verdict for the plaintiff.  See Hicks, 113 S. Ct. at 2749.  To prevail, the plaintiff must ultimately prove not that the illegitimate factor was the sole reason for the decision, but that the illegitimate factor was a determinative factor of the employment decision, that is, that but for the protected characteristic, the plaintiff would have been, for example, hired or promoted.  See Hazen Paper Co. v. Biggins, 113 S. Ct. 1701 (1993) (ADEA) (holding that "a disparate treatment claim cannot succeed unless the employee's protected trait actually played a role in [the decisionmaking] process and had a determinative influence on the outcome").

In Price Waterhouse, the Supreme Court borrowed the mixed-motives standard applied originally in a mixed-motives constitutional tort case, Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 97 S. Ct. 568 (1977), and adapted it for mixed-motives cases under Title VII.  See Price Waterhouse, 490 U.S. at 248-50, 109 S. Ct. at 1789-90 (plurality); id. at 258-59, 109 S. Ct. at 1795 (White, J., concurring); cf. id. at 277-78, 109 S. Ct. at 1805 (O'Connor, J., concurring); see also East Tex. Motor Freight Sys., Inc. v. Rodriguez, 431 U.S. 395, 404 n.9, 97 S. Ct. 1891, 1897 n.9 (1977); International Bhd. of Teamsters v. United States, 431 U.S. 324, 369 n.53, 97 S. Ct. 1843, 1872 n.53 (1977).  A mixed-motives case is one in which both legitimate and illegitimate factors contribute to the employment decision.  See Price Waterhouse, 490 U.S. at 232, 109 S. Ct. at 1781 (plurality). Such a case differs from a pretext case in that the plaintiff must present evidence of illegal discrimination "sufficiently strong to shift the burden of proof to the employer," meaning that the plaintiff must adduce "direct evidence" of discrimination (that is, more persuasive evidence than the McDonnell Douglas/Burdine prima facie case).  See Armbruster v. Unisys Corp., No. 93-1333, Mem. op. at 22-23 (3d Cir. July ??, 1994); Miller, No. 93-1773, 1994 WL 283269, at *12 n.6; Hook v. Ernst & Young, No. 92-3724, 1994 WL 283266, at *8-*9 (3d Cir. June 28, 1994); Price Waterhouse, 490 U.S. at 277-78, 109 S. Ct. at 1805 (O'Connor, J., concurring).

To rebut a plaintiff's case-in-chief in a mixed-motives case (that is, once the plaintiff has met his or her burden of proving an illegitimate factor "played a motivating [or substantial] part in an employment decision"), the employer must prove that "it would have made the same decision even if it had not allowed [the illegitimate factor] to play such a role."

11

B.  Other Circuits' Approaches to After-Acquired Evidence

The courts of appeals have grouped into two primary (albeit splintered) camps regarding the relevancy of after-acquired evidence of résumé and/or application fraud or employee misconduct on the job.[0]

1.  Courts Finding After-Acquired Evidence May Bar Liability

The Tenth Circuit formed the first camp with its seminal Summers decision.  Summers held that after-acquired evidence, at least if material, bars all relief and hence effectively operates as a complete defense to liability.  Based on after-acquired evidence of Summers' rampant on-the-job misconduct,[0] State Farm moved for summary judgment to diminish

---

Price Waterhouse, 490 U.S. at 244-45, 109 S. Ct. at 1787-88 (plurality); see id. at 242, 109 S. Ct. at 1786 (plurality). The employer's rebuttal is thus an affirmative defense.  See id. at 246, 109 S. Ct. at 1708 (plurality); id. at 259-60, 109 S. Ct. at 1795 (White, J., concurring); id. at 261, 109 S. Ct. at 1796 (O'Connor, J., concurring).  We note, however, that to the extent that Price Waterhouse barred all liability when the employer can show it would have taken the same action even had it not had any illegitimate motives, the 1991 Act overturned it.  See Civil Rights Act of 1991, Pub. L. No. 102-166, § 107, 105 Stat. 1075-76 (codified at 42 U.S.C.A. §§ 2000e-2(m), 2000e-5(g)(2)(B) (Supp. 1994)).

[0]The Supreme Court has granted certiorari to resolve this split during its next Term.  See McKennon v. Nashville Banner Publishing Co., 114 S. Ct. 2099 (1994).  At the time we heard oral argument, certiorari had not yet been granted in McKennon, and the parties asked the panel (and it agreed) to decide the case and not hold it in abeyance pending the probable grant of certiorari so that the case can proceed to a timely resolution.  Cf. Milligan-Jensen v. Michigan Tech. Univ., 114 S. Ct. 22 (1993) (dismissing the writ of certiorari in an after-acquired evidence case).

[0]Summers, a claims adjuster for the defendant insurance company, had been reprimanded on several occasions for falsifying company records and had eventually been placed on probationary suspension

12

the relief Summers could recover were he to prevail at the liability phase of trial.  See Summers, 864 F.2d at 702-03.  The Tenth Circuit held that the after-acquired evidence of Summers' on-the-job misconduct would not only limit Summers' remedies, but, by precluding Summers from any relief, the evidence would effectively avert State Farm's liability.

The court understood that technically McDonnell Douglas presupposed that a defendant could avert liability only with a legitimate, nondiscriminatory motive known to the employer at the instant of its actions.  See id. at 705.  Yet it reasoned -- apparently because State Farm would have fired him had it known of his transgressions -- that "while . . . after-acquired evidence cannot be said to have been a `cause' for Summers' discharge in 1982, it is relevant to Summers' claim of `injury,' and does itself preclude the grant of any present relief or remedy to Summers."  Id. at 708.  The court likened the plaintiff's situation to a "masquerading doctor," meaning one who was not really a doctor but who had pretended to be one, discharged for discriminatory reasons, who "would be entitled to no relief."  Id.

Since Summers, courts have allowed after-acquired evidence to bar the employer's liability in two general catego-

for two weeks.  About six months later, State Farm discharged him, not because of his falsification of records "but because of his poor attitude, inability to get along with fellow employees and customers, and similar problems dealing with the public and co-workers."  Four years later, during discovery, State Farm learned that on at least 150 occasions Summers had falsified company records, eighteen instances of which falsifications occurred after his return from suspended status.

ries of cases: résumé and/or application fraud cases, and misconduct on the job cases. In a case of résumé or application fraud, the employer typically asserts that, had it known of the plaintiff's misrepresentation(s), it would never have hired him or her. See Welch v. Liberty Machine Works, Inc., 23 F.3d 1403, ____ WL at *1, *3 (8th Cir. 1994) (brought under the Employee Retirement Income Security Act, 29 U.S.C.A. §§ 1001–1461 (1985 & Supp. 1994), and the Missouri Human Rights Act, MO. ANN. STAT. §§ 213.010–.137 (Vernon 1986 & Supp. 1994)). The employer may alternatively argue that, had it at any time after the hiring found out about the misrepresentation(s), it would have promptly fired the plaintiff.[0] See O'Driscoll v. Hercules, Inc., 12 F.3d 176, 177–78 (10th Cir. 1994) (expanding the Summers holding from misconduct to after-acquired résumé and application fraud cases), petition for cert. filed, 62 U.S.L.W. 3757 (Apr. 1, 1994) (No. 93-1728); Reed v. Amax Coal Co., 971 F.2d 1295, 1298 (7th Cir. 1992) (per curiam). In some cases employers advance both

---

[0]Some courts distinguish between "would not have hired" and "would have fired" cases on the basis that an employer would be more hesitant to fire a competent, capable employee than to not hire the applicant in the first place. See, e.g., Washington v. Lake County, Ill., 969 F.2d 250, 254, 255 n.5 (7th Cir. 1992). In Washington, the Seventh Circuit held that in cases where the employee actually was employed for some time, the "would not have hired" inquiry is irrelevant because "the temporal focus is on the time of the adverse employment decision." Id. at 256. As to the "would have fired" inquiry, however, the court somewhat inconsistently with its prior holding construed Price Waterhouse to allow the employer to defend its actions with after-acquired evidence, stating that in such situations "the employer must show by a preponderance of the evidence that, if acting in a race-neutral manner, it would have made the same employment decision had it known of the after-acquired evidence." Id. at 255 (emphasis supplied).

14

arguments in the alternative.  See Milligan-Jensen v. Michigan Technological University, 975 F.2d 302, 304 n.2 (6th Cir. 1992), cert. dismissed, 114 S. Ct. 22 (1993); Washington v. Lake County, Ill., 969 F.2d 250, 253 (7th Cir. 1992); Johnson v. Honeywell Information Systems, Inc., 955 F.2d 409, 414-15 (6th Cir. 1992);[0] cf. Dotson v. United States Postal Service, 977 F.2d 976, 978 (6th Cir.) (per curiam) (holding that the plaintiff's employment application misrepresentations rendered him unqualified for the job without addressing whether the employer would not have hired or would have fired him therefor), cert. denied, 113 S. Ct. 263 (1993).  Obviously in job misconduct cases (like Summers), only a variant of the latter "would have fired" argument can be made. Cf. McKennon v. Nashville Banner Publishing Co., 9 F.3d 539, 542-43 (6th Cir. 1993) (concluding that the plaintiff's job misconduct precluded her "claim of injury" and that consequently she was not entitled to "the grant of any relief or remedy"), cert. granted, 114 S. Ct. 2099 (1994).

2.  Courts Finding After-Acquired Evidence May Not Bar Liability

The opposing camp, exemplified by the Eleventh Circuit in Wallace v. Dunn Construction Co., 968 F.2d 1174 (1992) when it openly broke ranks with Summers,[0] allows after-acquired evidence

---

[0]Although Johnson involved a cause of action under Michigan's Elliott-Larsen Civil Rights Act, MICH. COMP. LAWS §§ 37.2101-.2804, the court construed it "in the same manner as its federal counterpart." 955 F.2d at 415 n.1.
[0]The first court of appeals after-acquired evidence case actually rejecting Summers was handed down by the Seventh Circuit in Smith v. General Scanning, Inc., 876 F.2d 1315 (1989), an ADEA suit. As the employer brought out during discovery, the plaintiff had

to come in only at the remedies stage to slim down the relief

---

falsified his college credentials on his résumé.  See id. at 1317.  The district court had held that the plaintiff's misrepresentation precluded the plaintiff from making out a prima facie case because he could not show that he was qualified for the position.  The court of appeals, cognizant of the Summers decision, rejected the district court's approach:

> By narrowly focusing on [the plaintiff's] initial burden, the district court was distracted from the real issue in this case.  At issue is the lawfulness of Smith's termination.  His resume fraud clearly had nothing to do with that; it surfaced only after [the plaintiff] was terminated and after this suit was commenced.  Whether [the employer] discriminated against [the plaintiff] must be decided solely with respect to the reason given for his discharge . . . .  His resume fraud is, for this purpose, irrelevant.

Id. at 1319.  The court noted in dicta that such evidence would be relevant at the remedies stage, however, because "it would hardly make sense to order [the plaintiff] reinstated to a job which he lied to get and from which he properly could be discharged for that lie."  Id. at 1319 n.2.

But subsequent cases in the Seventh Circuit leave that courts' approach the most unsettled, as panel after panel seems at sea without seriously heeding what bearings have been set before.  See Gilty v. Village of Oak Park, 919 F.2d 1247, 1251 (7th Cir. 1990) (not referencing Smith but holding that evidence of the plaintiff's fabrications exposed three years after the adverse employment decision would bar all liability); Washington v. Lake County, Ill., 969 F.2d 250, 253 & n.2 (7th Cir. 1992) (same, but noting that the plaintiff had not challenged the validity of the Summers rationale, and that he had not advanced the argument that he should at least, in accordance with the dicta in Smith, be accorded partial backpay); Reed, 971 F.2d at 1298 (approving Summers but giving it a restrained reading); Kristufek v. Hussmann Foodservice Co., 985 F.2d 364, 369, 370 (7th Cir. 1993) (departing from the reasoning of Washington and Reed without citing them, returning to Smith for the proposition that "the only issue is the lawfulness of the termination for the reasons given," and holding that "[a] discriminatory firing must be decided solely with respect to the known circumstances leading to the discharge").  Thus, while not exactly clear, the Seventh Circuit, after bouncing back and forth between the two camps for a while, seems now to have settled alongside Wallace.  See Kristufek, supra.

16

available to the plaintiff.[0]  The court, having had the benefit of the Supreme Court's exposition in Price Waterhouse (applying the Mt. Healthy framework to Title VII and clarifying the question of timing in mixed-motives cases, see supra at **Error! Bookmark not defined.** n.**Error! Bookmark not defined.**), criticized the Summers decision for misapplying Mt. Healthy, "in that the Summers rule ignores the lapse of time between the employment decision and the discovery of a legitimate motive for that decision."  Id. at 1179-80.  In doing so, the court continued, "the Summers rule clashes with the Mt. Healthy principle . . . that the plaintiff should be left in no worse a position than if she had not been a member of a protected class or engaged in protected opposition to an unlawful employment practice."  Id. at 1179.

The Eleventh Circuit was also persuaded that the Summers rule would result in underenforcement of the federal anti-employment discrimination laws and accordingly underdeter unlawful employment discrimination.  See id. at 1179-80.  Having resolved that after-acquired evidence does not preclude liability, the court concluded with a detailed exposition on the

---

[0]In Wallace, the plaintiff (Neil) had filed numerous causes of action against the employer under the Equal Pay Act and Title VII for wrongful discharge.  During her deposition, Neil admitted having falsified her employment application by omitting a conviction on drug charges.  Soon thereafter, the employer Dunn filed a motion for summary judgment, partially grounded in the Summers defense.  See id., 968 F.2d at 1176-77.

17

availability of the standard remedies in after-acquired evidence cases.[0]

### III.   OUR APPROACH

#### A.   The Liability Stage

#### 1.   After-Acquired Evidence Is Irrelevant at the Liability Stage

A quick review of the overarching framework erected for employment discrimination claims, see supra at **Error! Bookmark not defined.** n.**Error! Bookmark not defined.**, discloses why after-acquired evidence cannot be a defense to liability.  What sets an after-acquired evidence case far apart from a mixed-motives case

---

[0]With respect to reinstatement and front pay, the court held that those remedies would be inappropriate if the after-acquired evidence would have in and of itself led to the adverse employment action.  See id. at 1181-82.  An injunction against an employer's unlawful practices, it added, would not be available if the court did not also order the plaintiff reinstated.  See id. at 1182.  The court also determined, however, that after-acquired evidence would not affect the availability of declaratory relief.  See id.

According to the court, backpay should be awarded up until the date of judgment, unless the employer can prove that "it would have discovered the after-acquired evidence prior to what would otherwise be the end of the backpay period in the absence of the allegedly unlawful acts and this litigation."  Id.  This division, the court explained, would fairly balance the employer's right to make lawful employment decisions and the employee's right to make-whole relief. Ending the backpay period when the employer actually discovered the evidence would not make the victim whole, the court maintained, insofar as absent the unlawful conduct and the resulting litigation, the employer would very likely not have detected the fraud or misconduct.  See id.

Finally, with regard to the award of attorneys' fees, the court held that if the employee obtained "some benefit" from the lawsuit or if the litigation "materially altered" the parties' legal relationship, she would as a "prevailing party" be entitled to partial attorneys' fees; the after-acquired evidence could diminish the award by an amount arrived at using "traditional attorney fee principles." See id. at 1182-83.

like Price Waterhouse or a pretext case like McDonnell Douglas is that the articulated "legitimate" reason, which was non-existent at the time of the adverse decision, could not possibly have motivated the employer to the slightest degree.  After-acquired evidence, simply put, is not relevant in establishing liability under Title VII or ADEA because the sole question to be answered at that stage is whether the employer discriminated against the employee on the basis of an impermissible factor at the instant of the adverse employment action.  See Wallace, 968 F.2d at 1179 (pointing out that "the Summers rule ignores the lapse of time between the employment decision and the discovery of a legitimate motive for that decision").

The Supreme Court in Price Waterhouse held that in a mixed-motives case the employer could rely only on a legitimate motive it held at the time of the adverse employment decision. See 490 U.S. at 252, 109 S. Ct. at 1791 (plurality) ("An employer may not . . . prevail in a mixed-motives case by offering a legitimate and sufficient reason for its decision if that reason did not motivate it at the time of the decision." (emphasis supplied)); id. at 250, 109 S. Ct. at 1790 (plurality) (requiring the employer's legitimate, sufficient reason to have motivated the employer "at the moment of the decision"); id. at 241, 109 S. Ct. at 1785 (plurality) ("The critical inquiry . . . is whether [a protected characteristic] was a factor in the employment decision at the moment it was made." (emphasis in original)); id. at 259, 109 S. Ct. at 1795 (White, J., concurring) (stating that the employee must "show that the unlawful motive was a

19

substantial factor in the adverse employment action" (emphasis in original)); id. at 266-67, 109 S. Ct. at 1799 (O'Connor, J., concurring) (stating that the employer must show that "despite consideration of illegitimate factors the individual plaintiff would not have been hired or promoted in any event").

Thus, under the mixed-motives analysis, the employer in an after-acquired evidence case cannot contend that it would have reached the same decision at the time it was made absent the illicit motive. Concomitantly, under the pretext analysis, it should be simple for the employee to demonstrate beyond peradventure that the proffered legitimate (but after-acquired) reason was not the true cause for the decision but is merely a "pretext." See, e.g., Eastland v. Tennessee Valley Auth., 704 F.2d 613, 626 (11th Cir. 1983) (holding that the employer's proffered non-discriminatory reason was pretextual because the employer was unaware of the proffered reason at the time it made its decision), cert. denied, 465 U.S. 1066, 104 S. Ct. 1415 (1984); cf. McDonnell Douglas, 411 U.S. at 802, 805, 93 S. Ct. at 1824, 1826 (assuming that the employer was aware of the proffered reason at the time of the decision). Although Summers reasoned not that the after-acquired evidence would avoid liability but instead that it would bar all remedies, the effect is the same, and therefore the Summers rationale entirely eviscerates the temporal holding in Price Waterhouse that an employer can rely on a non-discriminatory justification for its action only if that justification actually motivated it at the time of its decision.

Having undermined the defendant's articulated legitimate explanation, under the standard employment discrimination burden-shifting scheme it would now be up to the factfinder to determine if the plaintiff met his or her burden of proving intentional discrimination. By removing this basic issue from the factfinder, courts applying the after-acquired evidence doctrine depart from the settled framework. Problematically, courts that allow after-acquired evidence to bar liability allow employers to make plaintiffs worse off for having a protected characteristic. That is because presumably, absent the wrong done the employee, the employer would not have discovered the "legitimate motive" evidence (at least during the relevant time frame) and the employee would still be employed. See Wallace, 968 F.2d at 1179 (observing that the Summers rule "excuses all liability based on what hypothetically would have occurred absent the alleged discriminatory motive assuming the employer had knowledge that it would not acquire until sometime during the litigation arising from the discharge" (some emphasis omitted)).

To assure that the plaintiff is restored to the position he or she would have occupied absent the employer's unlawful discrimination, when the employer's motive was exclusively discriminatory at the time of the decision (as is assumed arguendo in the Summers-type cases), a legitimate reason for the decision brought out later must not be used nunc pro tunc by the employer to justify its actions. See Welch, 23 F.3d at ____ WL at *4 (Arnold, J., dissenting) ("I think that the objects of deterrence and compensation both require us to examine a

21

defendant's mind for what it contained, not what it might have contained, to determine whether he has committed a wrong."). An employer's (assumed) discrimination is a deplorable wrong, and the fact that the employer might have accomplished a like result without maltreating the employee by employing different, nonharmful means (from the point of view of federal law) -- that is, by relying on legitimate instead of discriminatory reasons -- is beside the point, since if only it had used the other, defensible means there would have been no injury and no cause for the lawsuit.

2. Victims of Invidious Employment Discrimination Have Standing

Some members of the no-liability camp advance the rationale that the plaintiff lacks standing because he or she was not qualified for the position (qualification being an element of the plaintiff's McDonnell Douglas prima facie case), an argument pertaining to the employer's de jure, as opposed to Summer's de facto, non-liability. See Dotson, 977 F.2d at 977-78; Gilty v. Village of Oak Park, 919 F.2d 1247, 1251 (7th Cir. 1990).[0] That argument, however, is at odds with Supreme Court precedent.

---

[0] Cf. Williams v. Boorstin, 663 F.2d 109, 115-18 (D.C. Cir. 1980) (reaching the same conclusion as Dotson and Gilty that the plaintiff could not establish a prima facie case because he was unqualified, but there the employer had discovered the employee "lawyer" lacked a law degree before discharging him), cert. denied, 451 U.S. 985, 101 S. Ct. 2319 (1981); Mantolete v. Bolger, 767 F.2d 1416, 1423 (9th Cir. 1985) (holding that the district court did not abuse its discretion in allowing the defendant to introduce after-acquired evidence to rebut the plaintiff's prima facie case of qualification, but cautioning that it would be improper for the employer to use such evidence to justify its decision).

The plaintiff's McDonnell Douglas prima facie case was formulated to identify circumstances under which the discriminatory motive or intent of the employer may be inferred. See Hicks, 113 S. Ct. at 2747 (describing that the plaintiff's prima facie case gives rise to a presumption of discriminatory intent, which the defendant must rebut with evidence of a legitimate reason); Burdine, 450 U.S. at 253-54, 101 S. Ct. at 1094 (explaining that the plaintiff's prima facie case must "give rise to an inference of unlawful discrimination"); Furnco Constr. Corp. v. Waters, 438 U.S. 567, 576-77, 98 S. Ct. 2943, 2949-50 (1978) ("A prima facie case under McDonnell Douglas raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors."); Teamsters, 431 U.S. at 358, 97 S. Ct. at 1866. This reading is substantiated by the fact that the pliant McDonnell Douglas prima facie case is only one of many alternative routes available for a plaintiff to travel, amongst which is direct evidence bearing on discriminatory intent. See, e.g., United States Postal Serv. v. Aikens, 460 U.S. 711, 715, 103 S. Ct. 1478, 1482 (1978).[0] Consequently, what is relevant to the inquiry is the employer's subjective assessment of the plaintiff's qualifications, not the plaintiff's objective ones if unknown to the employer.[0] In other words, the

---

[0]Even were the Dotson and Gilty "no standing" rationale persuasive in McDonnell Douglas type cases, it could not help the employer in cases (such as this one) where the plaintiff adduces direct evidence of disparate treatment.
[0]Many courts construing Title VII or ADEA have so held. See, e.g., Kristufek v. Hussmann Foodservice Co., 985 F.2d 364, 369

strength of the inference of discrimination based on the prima facie case is independent of the plaintiff's qualifications that were unknown to the employer.

The no-standing argument additionally runs counter to the plain meaning of Title VII and ADEA. Those statutes grant standing to "any individual" discriminated against by a covered employer. See 42 U.S.C.A. § 2000e-2(a) (1981); 29 U.S.C.A. §

(7th Cir. 1993); Wallace, 968 F.2d at 1179; Smith v. General Scanning, Inc., 876 F.2d 1315, 1319 (1989); Sabree v. United Bhd. of Carpenters & Joiners Local No. 33, 921 F.2d 396, 402 (1st Cir. 1990); Norris v. City & County of San Francisco, 900 F.2d 1326, 1331 (9th Cir. 1990); Hill v. Seaboard C. L. R.R. Co., 767 F.2d 771, 774 (11th Cir. 1985), aff'd on reh'g, 885 F.2d 804 (11th Cir. 1989); Cuddy v. Carmen, 762 F.2d 119, 127 & n.12 (D.C. Cir.), cert. denied, 474 U.S. 1034, 106 S. Ct. 597 (1985); Eastland v. Tennessee Valley Auth., 704 F.2d 613, 626 (11th Cir. 1983), cert. denied, 465 U.S. 1066, 104 S. Ct. 1415 (1984); Lee v. National Can Corp., 699 F.2d 932, 937 (7th Cir.), cert. denied, 464 U.S. 845, 104 S. Ct. 148 (1983); cf. Price Water-house, 490 U.S. at 252, 109 S. Ct. at 1791; Teamsters, 431 U.S. at 369 n.53, 97 S. Ct. at 1872 n.53 (illustrating that an employer may rebut a plaintiff's prima facie case by showing that "the nonapplicant's stated qualifications were insufficient" (emphasis supplied)); see also Regents of University of Cal. v. Bakke, 438 U.S. 265, 320 n.54, 98 S. Ct. 2733, 2764 n.54 (1978) ("Having injured respondent solely on the basis of an unlawful classification, petitioner cannot now hypothesize that it might have employed lawful means of achieving the same result.").

This temporal knowledge limitation distinguishes a statutory unlawful discrimination claim from a contractual wrongful termination claim. In contract actions, if one party commits a material breach, the other party may generally use it to justify nonperformance even if, at the time of its own nonperformance, the second party was unaware of the first party's material breach. See College Point Boat Corp. v. United States, 267 U.S. 12, 15-16, 45 S. Ct. 199, 200-01 (1925); REST.2D CONTRACTS § 385 cmt. a (1981); id. § 225 & cmt. e; id. § 237 & cmt. c; cf. id. § 164 (fraudulent inducement makes a contract voidable). In a contract claim, questions like unidentified misrepresentations and the signing of an attestation clause are accordingly important. But in our view it is specious to conflate the two very different causes of action.

24

623(a) (1985).  The result is no different if one focuses on the definition of "employee" rather than "individual," since both statutes define an "employee" as "an individual employed by an employer."  42 U.S.C.A. § 2000e(f) (1981); 29 U.S.C.A. § 630(f) (1985).  The point is that neither definition contains an exception for individuals who would not have been employed by the employer but for their fraud or misconduct, or for employees who measured against some objectively defined criteria are "unquali- fied." Congress having granted standing in the circumstances we consider here, the matter is settled.  See Kenneth G. Parker, Note, After-Acquired Evidence in Employment Discrimination Cases: A State of Disarray, 72 TEX. L. REV. 403, 428 (1993) ("Simply put, the ability of the plaintiff to sue is delineated by the statute itself, and [the] remedy should be determined with reference to the dual purposes of making the plaintiff whole and deterring a discriminating employer.").

### 3.  Victims of Invidious Employment Discrimination Suffer Real and Legal Injury

Summers understood that "McDonnell Douglas clearly presupposes a `legitimate, nondiscriminatory reason' known to the employer at the time of the employee's discharge."  864 F.2d at 705 (emphasis in original).  Summers reached its conclusion that the employer would not be liable for the different, practical (as opposed to legal) reason that, the plaintiff not having been "injured," he or she could obtain no relief.  We disagree.

25

Reasoning that the plaintiff suffered no legal injury from invidious discrimination when after-acquired evidence reveals résumé fraud or work misconduct, see Summers, 864 F.2d at 708 (assuming that the employer's decision was motivated by an illegitimate reason); McKennon, 9 F.3d at 541, 542 (same); Milligan-Jensen, 975 F.2d at 305 (same); Washington, 969 F.2d at 255, 256-57 (same); Johnson, 955 F.2d at 415 (same), defies common sense. Imagine, for instance, an employer which intentionally batters an employee who procured his or her position through fraud or who falsified company records. The Summers rationale would bar the employee's recovery in an appropriate action because the employee had no "right" to be where he or she was at the moment of his or her injury. Surely that result flies in the face of reason and the whole body of tort law.[0] Accord Welch, 23 F.3d at WL at *4 (Arnold, J., dissenting).

---

[0] In Baab v. AMR Servs. Corp., 811 F. Supp. 1246 (N.D. Ohio 1993), the court concluded in context of an intentional-infliction of emotional distress claim tacked on to an employment discrimination suit that

> one could take the view that plaintiff should not complain of injury inflicted upon her at her workplace when, had the defendant been apprised of her wrongdoing, she would not have been there in the first place. This argument . . . misses the mark. The injury complained of here is injury to one's person and plaintiff is entitled to be free of that injury regardless of her status as a dischargeable employee.

Id. at 1262. But cf. Russell v. Microdyne Corp., 830 F. Supp. 305, 306-08 (E.D. Va. 1993) (supplanting the Summers rationale to sexual harassment situations); Churchman v. Pinkerton's Inc., 756 F. Supp. 515, 518-21 (D. Kan. 1991) (same); Mathis v. Boeing

The rationale might have a stronger bite to it were the only injury to the victim the adverse employment action per se;[0] but, quite to the contrary, in an employment discrimination suit the traumatic injury is having been subjected to the adverse employment action because of one's race, sex, age, or other protected characteristic, that is, having been unlawfully discriminated against. Put more dramatically, to maintain that a victim of employment discrimination has suffered no injury is to deprecate the federal right transgressed and to heap insult ("You

Military Airplane Co., 719 F. Supp. 991, 994-95 (D. Kan. 1989) (same).

Indeed, even one whom the defendant knows to be a wrongdoer at the time of the defendant's actions is not too unworthy in the eyes of the law to recover for an unprivileged intentional or even a negligent tort. See REST.2D TORTS § 889 & cmts. a, b (1979) ("One is not barred from recovery for an interference with his legally protected interests merely because at the time of the interference he was committing a tort or a crime . . . ."); id. § 890 (discussing privileges); cf. id. § 870 & cmt. e (1979) ("One who intentionally causes injury to another is subject to liability to the other for that injury, if his conduct is generally culpable and not [privileged].").

Certainly, the defendant who does not know that the victim is a wrongdoer at the time the tort is committed has no privilege to inflict the harm. And it would seem that if one has no privilege --because there is missing some provocation or circumstance establishing the privileges of self-defense, defense of property, or defense of others -- to injure a known trespasser deliberately, a fortiori one has no such privilege with respect to someone invited onto the premises, albeit the invitation be procured through trick.

[0]Although even were that the case an argument can be made that the plaintiff was still legally injured since, absent the discrimination, he or she would still have been employed and the employer presumably would not have exposed the fraud or misconduct for some unknown span of time. See Massey v. Trump's Castle Hotel & Casino, 828 F. Supp. 314, 322 (D.N.J. 1993) ("Absent those illegal motives, the employee would still be employed. Thus, an illegal discharge causes an injury regardless of an employee's previous misconduct, and that injury must be subject to some redress.").

had it coming") upon injury.  Cf. Richard Granofsky & Jay S. Becker, After-Acquired Evidence in Employment Discrimination Cases, 36 DEF. 19, 24 (1994) (referring to such employees as "unworthy").  A victim of discrimination suffers a dehumanizing injury as real as, and often of far more severe and lasting harm than, a blow to the jaw.[0]  See H.R. REP. No. 40(I), 102d Cong., 1st Sess. 15 (1991), reprinted in 1991 U.S.C.C.A.N. 549, 553 ("The Committee intends to confirm that the principle of anti-discrimination is as important as the principle that prohibits assaults, batteries and other intentional injuries to people.").

In the 1991 Act, Congress understood as much and changed the result reached in Price Waterhouse:  in cases decided

---

[0]See United States v. Burke, 112 S. Ct. 1867, 1872 (1992) ("It is beyond question that discrimination in employment on the basis of sex, race, or any of the other classifications protected by Title VII is, as . . . this Court consistently has held, an invidious practice that causes grave harm to its victims."); H.R. REP. No. 40(I), 102d Cong., 1st Sess. 14 (1991) ("Victims of intentional discrimination often endure terrible humiliation, pain and suffering while on the job. This distress often manifests itself in emotional disorders and medical problems."), reprinted in 1991 U.S.C.C.A.N. 549, 552; id. at 66-69 (documenting the disastrous effects of invidious discrimination on its victims), reprinted in 1991 U.S.C.C.A.N. at 604-07; Pauline Yoo, Note, The After-Acquired Evidence Doctrine, 25 COLUM. HUM. RTS. L. REV. 219, 252 & n.201 (1993) ("Discrimination can damage a victim emotionally, psychologically, or physically."); id. at 243 & n.150 (same); Cheryl K. Zemelman, Note, The After-Acquired Evidence Defense to Employment Discrimination Claims:  The Privatization of Title VII and the Contours of Social Responsibility, 46 STAN. L. REV. 175, 199-200 (1993) [hereinafter Zemelman, The After-Acquired Evidence Defense]; see also Civil Rights Act of 1991, Pub. L. No. 102-166, § 107(b), 105 Stat. 1075-76 (codified at 42 U.S.C.A. § 2000e-5(g)(2)(B) (Supp. 1994)) (allowing a court to grant a victim in a mixed-motives case declaratory and injunctive relief and to award him or her attorneys' fees and costs even if the employer had a legitimate, sufficient motive when it acted).

under the 1991 Act, the plaintiff is entitled to some relief even if the employer actually would have taken the same action at the same time absent any invidious motive.  See Civil Rights Act of 1991, Pub. L. No. 102-166, § 107, 105 Stat. 1075-76 (codified at 42 U.S.C.A. §§ 2000e-2(m), 2000e-5(g)(2)(B) (Supp. 1994)).

Moreover, we think it clear that, where a federal right has been violated, federal courts must provide a remedy.  The right which is violated by an employer which discriminates on the basis of a protected characteristic is not the employee's right to the job, but the employee's right to equal, fair, and impartial treatment, the violation of which frequently results, inter alia, in a significant injury to the victim's dignity and a demoralizing impairment of his or her self-esteem.  See supra at **Error! Bookmark not defined.** n.**Error! Bookmark not defined.**; cf. H.R. REP. No. 40(I) at 64-65, reprinted in 1991 U.S.C.C.A.N. at 602-03; Brown v. Board of Educ., 347 U.S. 483, 494, 74 S. Ct. 686, 691-92 (1954); see also Civil Rights Act of 1991, Pub. L. No. 102-166, § 102, 105 Stat. 1072-73 (codified at 42 U.S.C.A. § 1981a(b)(3) (Supp. 1994)) (providing a plaintiff may recover compensatory damages under Title VII for "emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses").  The plaintiff's deceit or misconduct toward the employer is most appropriately considered in the remedies stage, or in any claim compatible with the federal anti-discrimination laws that the employer may properly assert against the employee under appropriate state or federal law.  See Massey, 828 F. Supp. at 323 ("[I]f the employer has

somehow been damaged by the plaintiff's misrepresentations or misconduct on the job, it may seek its own damages where appropriate.").

The Summers rationale confuses the question whether the employer injuriously discriminated against the employee with the question whether the employee had an entitlement to the job. Whether the employee had some "right" to the job in question is not an issue in a Title VII or ADEA action; the issue is whether the employer discriminated based on an impermissible factor. Besides receiving no mention in the statutes, the "property right" inquiry is irrelevant for the simple reason that both Title VII and ADEA operate against the presumed backdrop of at-will employment, meaning that the employee is presumptively not entitled to the job, irrespective of résumé fraud or performance misconduct. Under the traditional employment-at-will doctrine, an employer may discipline or terminate an employee for any reason or no reason.[0] Thus, if entitlement to the job were a

---

[0] See, e.g., Poff v. Western Nat'l Mut. Ins. Co., 13 F.3d 1189, 1191 (8th Cir. 1994) (Minnesota law); Richards v. General Motors Corp., 991 F.2d 1227, 1234-35 (6th Cir. 1993) (Michigan law); Hall v. Western Prod. Co., 988 F.2d 1050, 1058-59 (10th Cir. 1993) (Wyoming law); Carlson v. Arnot-Ogden Memorial Hosp., 918 F.2d 411, 414 (3d Cir. 1990) (Pennsylvania law).

While the federal anti-employment discrimination laws were not designed to impinge directly upon employer free choice, indirect effects are inevitable. No doubt the federal employment discrimination laws have curtailed the more excessive aspects of the employment-at-will doctrine with respect to protected persons. Now, a covered employer who arbitrarily and capriciously terminates a protected person without any animus toward the protected characteristic runs a not insubstantial risk of liability. For example, the Supreme Court has intimated that an arbitrary and capricious rationale may not meet the employer's burden of rebutting a plaintiff's prima facie case of

30

prerequisite to liability or recovery, then <u>no</u> at-will employee could recover under Title VII or ADEA -- but that plainly is not the case. See <u>Washington</u>, 969 F.2d at 256 ("A `property right' in one's job . . . is not a requirement in a federal discrimination claim.").

What <u>is</u> the case is that neither Title VII nor ADEA strips a wrongdoing employee of his or her entitlement to protection against unlawful discrimination.  Instead of focusing on the worthiness of the victim, the statutes exclusively and unambiguously fix on the employer's motives.  See <u>Alexander v. Gardner-Denver Co.</u>, 415 U.S. 36, 51, 94 S. Ct. 1011, 1021 (1974) ("Title VII's strictures are absolute and represent a congressional command that <u>each</u> employee be free of discrimination." (emphasis supplied)); <u>Massey</u>, 828 F. Supp. at 323 ("There is nothing in [Title VII] itself to support a requirement that the job had been acquired honestly.").  An employee's fraud or misconduct, while bearing on his or her fitness for the job, simply does not justify, excuse, or make harmless the employer's intentional, invidious discrimination.  Because the <u>Summers</u> approach ignores these precepts, thereby denying remedial justice for a grievous injury, we reject that approach.

_____

discrimination.  See <u>Burdine</u>, 450 U.S. at 255, 101 S. Ct. at 1094 ("The [legitimate] explanation [the defendant] provided must be legally sufficient to justify a judgment for the defendant."); <u>McDonnell Douglas</u>, 411 U.S. at 802-03, 93 S. Ct. at 1824 ("We need not attempt in the instant case to detail every matter which fairly could be recognized as a reasonable basis for a refusal to hire.").  Nevertheless, the employment-at-will doctrine has been abridged only to the extent necessary to enforce the federal employment discrimination laws.

4.  Summers <u>Ignores the Compelling Public Interest in Enforcement</u>

Besides slighting the very real injury suffered by a victim of employment discrimination, the <u>Summers</u> rule disregards that an act of employment discrimination is much more than an ordinary font of tort law.  The anti-employment discrimination laws are suffused with a public aura for reasons that are well known.  Throughout this Nation's history, persons have far too often been judged not by their individual merit, but by the fortuity of their race, the color of their skin, the sex or year of their birth, the nation of their origin, or the religion of their conscientious choosing.  Congress has responded to these pernicious misconceptions and ignoble hatreds with humanitarian laws formulated to wipe out the iniquity of discrimination in employment, not merely to recompense the individuals so harmed but principally to deter future violations.

The anti-employment discrimination laws Congress enacted consequently resonate with a forceful public policy vilifying discrimination.[0]  A plaintiff in an employment-

---

[0]<u>See</u>, <u>e.g.</u>, <u>Aikens</u>, 460 U.S. at 716, 103 S. Ct. at 1482 ("The prohibitions against discrimination contained in the Civil Rights Act of 1964 reflect an important national policy."); <u>Franks v. Bowman Transp. Co.</u>, 424 U.S. 747, 778 n.40, 96 S. Ct. 1251, 1271 n.40 (1976) (stating that "claims under Title VII involve the vindication of a major public interest" (internal quotations omitted)); <u>id.</u> at 763, 96 S. Ct. at 1263 ("[Congress] ordained that its policy of outlawing [discrimination on the basis of race, religion, sex, or national origin] should have the `highest priority' . . . ."); <u>Alexander</u>, 415 U.S. at 45, 94 S. Ct. at 1018 ("[T]he private litigant not only redresses his own injury but also vindicates the important congressional policy against discriminatory employment practices."); <u>cf.</u> <u>Newman v. Piggie Park</u>

32

discrimination case accordingly acts not only to vindicate his or her personal interests in being made whole, but also as a "private attorney general" to enforce the paramount public interest in eradicating invidious discrimination.[0]

In sum, it appears that the employee's misconduct or fraud is a possible wrong against the employer, whereas the employer's discrimination is a wrong against the employee and society at large. See Massey, 828 F. Supp. at 323 ("Any concern

Enters., 390 U.S. 400, 402, 88 S. Ct. 964, 966 (1968) (per curiam) (decided under Title II of the Civil Rights Act of 1964) (stating that Congress intended the struggle against discrimination to be a policy "of the highest priority").

[0]See EEOC v. Associated Dry Goods Corp., 449 U.S. 590, 602, 101 S. Ct. 817, 824 (1981) ("Congress considered the charging party a `private attorney general,' whose role in enforcing the ban on discrimination is parallel to that of the [Equal Employment Opportunity] Commission itself." (citing Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 421, 98 S. Ct. 694, 700 (1978)); New York Gaslight Club, Inc. v. Carey, 447 U.S. 54, 63, 100 S. Ct. 2024, 2030-31 (1980); Albemarle Paper Co. v. Moody 422 U.S. 405, 415, 95 S. Ct. 2362, 2370 (1975); Alexander, 415 U.S. at 45, 94 S. Ct. at 1018; see also Newman, 390 U.S. at 401-02, 88 S. Ct. at 966 (decided under Title II of the Civil Rights Act of 1964).

In the Civil Rights Act of 1991, by authorizing a court to grant a victim of discrimination in a mixed-motives case declaratory and injunctive relief and partial attorneys' fees and costs, Congress again recognized the public interest in eradicating discrimination even when the employer had acted at the time of its decision for a legitimate reason that would have propelled it to take the same actions standing alone. See Civil Rights Act of 1991, Pub. L. No. 102-166, §107(b), 105 Stat. 1075-76 (codified at 42 U.S.C.A. § 2000e-5(g)(2)(B) (Supp. 1994)). That is, the 1991 Act reinforces the common sense notion that, even if the plaintiff is entitled to no personal relief, at least the remedies inuring to the public's benefit -- a declaratory judgment, injunctive relief, and, derivatively, attorneys' fees, see supra (discussing the litigant's role as a private attorney general) -- should be considered in an after-acquired evidence case. Since those remedies do not economically benefit the plaintiff, that provision evidences a strong public policy in favor of enforcement of the anti-employment discrimination laws.

we may have in awarding damages to employees who have acquired their jobs improperly does not outweigh the plaintiff's statutory right to recover . . . ."). The Summers approach unjustifiably exalts the employer's purely private state right above the employee's quasi-public federal one.

5. Non-Liability Undermines the Statutes' Purposes

As described supra Part 31, Congress prescribed a strong medicine, the anti-employment discrimination laws, to cure the social malady of invidious discrimination. Deterrence is accomplished by placing an economic price on discriminatory acts, and by exposing and stigmatizing the wrongdoer's acts before the entire community. We also bear in mind that, as remedial statutes, Title VII and ADEA should be liberally construed to advance their beneficent purposes.[0] Unfortunately, the Summers approach disregards that canon of construction and frustrates the paramount objective of Title VII and ADEA, to deter violations of

---

[0] See, e.g., Hart v. J. T. Baker Chem. Co., 598 F.2d 829, 831 (3d Cir. 1979) (Title VII); Oscar Mayer & Co. v. Evans, 441 U.S. 750, 765-66, 99 S. Ct. 2066, 2076 (1979) (Blackmun, J., concurring) (ADEA); Holliday v. Ketchum, MacLeod & Grove, Inc., 584 F.2d 1221, 1229 (3d Cir. 1978) (in banc) (same); cf., e.g., Dennis v. Higgins, 498 U.S. 439, 443, 111 S. Ct. 865, 868 (1991) (section 1983).

One overriding lesson the 1991 Act tutors all but its most unmindful reader is that Congress was unhappy with increasingly parsimonious constructions of Title VII. Essentially, Congress forcefully reminded courts of the canon that Title VII and ADEA, as remedial statutes, are to be construed liberally to promote their welfare purposes, equality of treatment and employment opportunities.

the law.[0]  See Wallace, 968 F.2d at 1180-81; cf. Price

Waterhouse, 490 U.S. at 265, 109 S. Ct. at 1798 (O'Connor, J.,

concurring) (stating that if "an illegitimate criterion was a

substantial factor in an adverse employment decision, the

deterrent purpose of [Title VII] has clearly been triggered."

(emphasis in original)).

A strong deterrence policy is the needed stimulus to

propel otherwise indifferent employers into taking affirmative

steps to educate and discipline members of their workforce

insensitive to or disdainful of their co-workers' civil rights.

Economic penalties work as reliable engines to drive home

forcefully to rational employers the seriousness and solemnity of

our national policy denouncing discrimination, and thereby

inspire affirmative responses.  See Albemarle Paper, 422 U.S. at

417-18, 95 S. Ct. at 2371-72 ("It is the reasonably certain

prospect of a backpay award that provide[s] the spur or catalyst

which causes employers . . . to self-examine and to self-evaluate

their employment practices and to endeavor to eliminate, so far

_____

[0]"The `primary objective' of Title VII is to bring employment
discrimination to an end."  Ford Motor Co. v. EEOC, 458 U.S. 219,
228, 102 S. Ct. 3057, 3063 (1982) (citing Albemarle Paper, 422
U.S. at 417, 95 S. Ct. at 2371); see 28 U.S.C.A. § 621(b) (1985)
(listing the purposes of ADEA, including "to prohibit arbitrary
age discrimination in employment"); Zinger v. Blanchette, 549
F.2d 901, 905 (3d Cir. 1977) ("The primary purpose behind [ADEA]
is to prevent age discrimination in hiring and discharging
workers."), cert. denied, 434 U.S. 1008, 98 S. Ct. 717 (1978).
Compensating victims to make them whole, while also of great
weight, is a secondary objective.  See Albemarle Paper, 422 U.S.
at 417-18, 95 S. Ct. at 2371-72; cf. Teamsters, 431 U.S. at 364,
97 S. Ct. at 1869 (stating that the deterrence and compensatory
purposes are "equally important").

35

as possible, the last vestiges of an unfortunate and ignominious page in this country's history." (internal quotations omitted)); cf. Landgraf v. USI Film Prods., 114 S. Ct. 1483, 1506 & n.35 (1994) (recognizing that liability impacts "private parties' planning"); City of Riverside v. Rivera, 477 U.S. 561, 575, 106 S. Ct. 2686, 2694 (1986) (plurality) (section 1983) (stating that "the damages a plaintiff recovers contribute significantly to the deterrence of civil rights violations in the future").[0]

---

[0]On the other hand, allowing employees or applicants who committed fraud or misbehaved on the job to prevail will not notably diminish their disincentive to wrong or deceive their employers or their prospective employers.  It seems unreasonable to attribute to the wrongdoing employee or applicant the strategy to lie to or cheat his or her employer or prospective employer with the expectation that, if the employer unlawfully discriminates against him or her, it will not be able to use that wrongful conduct against him or her if discovered in the course of the resulting proceedings.  See Massey, 828 F. Supp. at 322 n.10 ("We find it preposterous that an employee would refrain from lying [on a résumé or employment application] because she anticipates that she may be illegally discriminated against later and wants to preserve her right to recover damages.").  Applicants misrepresent their qualifications in order to secure the employment in the first place, a powerful incentive that will not be curtailed by the unlikely prospect, of which the great bulk of applicants and employees will be unaware, that the employer may discover the falsehood in an employment discrimina-tion action and will be able to exploit it to bar the employee's or applicant's claim.  The applicant's incentive not to be dishonest, and the employee's incentive not to breach his or her duties of truthfulness, loyalty, and obedience, stem from the fact that he or she is always subject to disciplinary measures if the employer learns of the wrong outside the context of discovery in an employment discrimination case.  The only applicant or employee incentive that will wane if after-acquired evidence is allowed to bar all liability is the plaintiff's vindication of his or her federal rights when he or she is unlawfully discriminated against, even where the discrimination is ongoing, especially since any attorney the plaintiff might consult would presumably become aware of the rule.
       We note in passing that many employers in fact responsibly investigate applicants across-the-board before hiring

Of course, the efficacy of the after-acquired evidence tactic has not escaped the attention of defense counsel, some of whom have recommended that, to maximize a client's odds of success, defense counsel's first step when defending an employment discrimination claim should be thoroughly to investigate the plaintiff's background and job performance. Indeed, many have instructed employers on specific policies they can implement to erect the strongest possible defense in employment discrimination suits, and, if recognized, one can anticipate the extensive and effective use of the after-acquired evidence doctrine.[0]  The prospect of a defendant's thorough

someone, and that the employer's need for truthful employment applications has been sharpened with the spread of employer liability for "negligent hiring." An employment-discrimination suit brought by a discharged employee or unsuccessful applicant, however, does not provide a sound business (as opposed to litigation) reason for the employer to begin investigating its ex-employee's or applicant's honesty and fidelity.

[0]See James A. Burstein & Steven L. Hamann, Better Late Than Never -- After-Acquired Evidence in Employment Discrimination Cases, 19 EMPLOYEE REL. L.J. 193, 202-03 (1993) ("[A]fter-acquired evidence should be factored in crafting personnel policies.  Foremost among the considerations is to ensure that applications and employee manuals expressly state that resumé fraud or application misrepresentations will result in suspension pending discharge. . . . Second, a prompt and thorough investigation of a complaint's discrimination charge should be conducted."); David D. Kadue & William J. Dritsas, The Use of After-Acquired Evidence in Employee Misconduct and Resume Fraud Cases, 1993 LAB. L.J. 531, 531 [hereinafter Kadue & Dritsas, The Use of After-Acquired Evidence] (stating that when an employee sues for employment discrimination, commonly "the employer investigates the former employee's background with special care"); George D. Mesritz, "After-Acquired" Evidence of Pre-Employment Representations:  An Effective Defense Against Wrongful Discharge Claims, 18 EMPLOYEE REL. L.J. 215, 215, 222-25 (1992) ("Management should respond to this favorable development [-- the judicial recognition of the after-acquired evidence doctrine --] by routinely searching for pre-employment misrepresentations as a potential defense in all

inquiry into the details of a plaintiff's pre- and post-hiring

conduct, however, may chill the enthusiasm and frequency with

which employment discrimination claims are pursued, even in cases

where the victim of discrimination has nothing to hide, let alone

cases where the potential plaintiff is not entirely blameless.[0]

Placed in context of the general pervasiveness of résumé fraud

and employee misconduct,[0] the likely consequence of the wide-

discharge litigation.  Employers in turn should maximize the
probability that `after-acquired' evidence is available as a
defense by revising employment applications to elicit even more
specific information."); Robert M. Shea, Posttermination
Discovery of Employee Misconduct:  A New Defense in Employment
Discrimination Litigation, 17 EMPLOYEE REL. L.J. 103, 103-04, 109
(1991) [hereinafter Shea, Posttermination Discovery of Employee
Misconduct] (explaining that Summers "gives employers a legal
basis and, more importantly, a good reason for taking a broader
approach to discovery in employment discrimination litigation"
and advising employers to "scrutinize representations made by the
plaintiff during the hiring process" and to look for "previously
undiscovered misconduct"); William S. Waldo & Rosemary A. Mahar,
Lost Cause and Found Defense:  Using Evidence Discovered After an
Employee's Discharge to Bar Discrimination Claims, 9 LAB. LAW. 31,
32, 40-42 (1993) (advising defense counsel to "leave no stone
unturned in ferreting out any evidence" of résumé fraud or
employment misconduct by conducting "a thorough post-termination
investigation").
[0]See Massey, 828 F. Supp. at 323 (reasoning that "the use of
after acquired evidence to bar a discrimination claim in its
entirety could cause employees who did something wrong in the
past to quietly endure discriminatory treatment rather than
complain, regardless of how long ago the misconduct occurred or
its triviality").  Moreover, the inevitable "fishing expedition[]
. . . for `minor, trivial or technical infractions,'" Washington,
969 F.2d at 256 (quoting O'Driscoll v. Hercules, Inc., 745 F.
Supp. 656 (D. Utah 1990)), might curtail the success of victims
of employment discrimination in bringing lawsuits and thereby
erode the effectiveness of Title VII and ADEA.  See, e.g.,
McKennon, 9 F.3d at 540-41 & nn.1 & 3 (describing the employer's
masterful use of after-acquired evidence).
[0]By all accounts, résumé fraud is a serious and recurrent problem
facing employers.  See, e.g., Mitchell H. Rubinstein, The Use of
Predischarge Misconduct Discovered After an Employee['s]
Termination as a Defense in Employment Litigation, 24 SUFFOLK U.

spread exploitation of after-acquired evidence will be underenforcement of Title VII and ADEA, and consequently underdeterrence of discriminatory employment practices.[0]

This leads us to a final reason why liability is proper in a Title VII or ADEA after-acquired evidence case, namely, the other paramount objective of those statutes "`to make persons whole for injuries suffered on account of unlawful employment discrimination.'" Franks, 424 U.S. at 763, 96 S. Ct. at 1264 (quoting Albemarle Paper, 422 U.S. at 418, 95 S. Ct. at 2372); see id. at 764, 96 S. Ct. at 1264 (stating that the plaintiff should be made "whole insofar as possible"); see Albemarle Paper, 422 U.S. at 418-21, 95 S. Ct. at 2372-73; supra at **Error! Bookmark not defined.** n.**Error! Bookmark not defined.**. Of course, the corollary to the make-whole directive is that the protected

---

L. REV. 1, 1 n.2 (1990); Shea, Posttermination Discovery of Employee Misconduct, 17 EMPLOYEE REL. L.J. at 403 n.3; Zemelman, The After-Acquired Evidence Defense, 46 STAN. L. REV. at 176 n.5; see also Douglas L. Williams & Julia A. Davis, Title VII Update -- Skeletons and a Double-Edged Sword, C669 A.L.I.-A.B.A. 303, 305 (1991) ("At one time or another probably every employee commits an infraction at work and hopes that the boss never finds out.").

[0]Some courts have tried to deal with the problem of underenforcement by requiring the fraud or misconduct to be material before accepting the employer's defense, see, e.g., O'Driscoll, 12 F.3d at 180, but the meaning of materiality has not been settled. For example, at least one court confronted with a boilerplate attestation clause in an employment application has held that the misrepresentation itself, whether material or not standing alone, became material by virtue of the clause, rendering the materiality requirement largely meaningless. See Milligan-Jensen, 975 F.2d at 303-04 & nn. 1 & 2; cf. Johnson, 955 F.2d at 414 (holding that an employer's asserted actual reliance upon the plaintiff's misrepresentation made it material as a matter of law); Gilty, 919 F.2d at 1251 (holding that a plaintiff's misrepresentation ipso facto rendered him unqualified for the job).

employee is not to be catapulted into a better position than he or she would have enjoyed had the employer not acted unlawfully. See Burdine, 450 U.S. at 259, 101 S. Ct. at 1096 ("Title VII . . . does not demand that an employer give preferential treatment to minorities or women."); cf. Mt. Healthy, 429 U.S. at 285-86, 97 S. Ct. at 575.

Keeping in mind the aspiration, then, that the plaintiff should be left in the same position as he or she was in before the discrimination, the bottom line is straightforward. On the one hand, holding the employer liable and providing the victim appropriately fashioned remedies would restore the victim to his or her prior position, not a better one than had he or she not suffered from unlawful discrimination. On the other hand, barring all remedies would leave the victim in a worse position than had the employer not unlawfully discriminated against him or her (in which case the employee assumedly would still be employed), and elevates the employer to a superior position insofar as it lets the employer get off scot-free despite its blameworthy conduct. These two observations hold true especially in instances where the employer's discovery of the after-acquired evidence was brought about due to the legal proceedings instituted in response to the employer's wrongful acts, since in those cases, absent the discrimination, the employer may never have discovered the evidence (or at least not until some indeterminate future time). See Wallace, 968 F.2d at 1179-80;

40

Welch, 23 F.3d at WL at *3 (Arnold, J., dissenting);[0] cf. John
Cuneo, Inc., 298 N.L.R.B. 856, 856 (1990).  In short, a major
weakness of the Summers approach is that it does not restore a
victim to the position he or she would have occupied but for the
discrimination.


### 6.  Summary

For all the foregoing reasons, we hold that after-
acquired evidence is inadmissible, because irrelevant, at the
liability stage of a cause of action brought under Title VII or
ADEA.  We do not rule out the potentiality that such evidence may

---

[0]We think that Judge Arnold got the better of the argument in his
dissent in Welch:

> I respectfully suggest that the court errs in
> concluding that if defendant can show that it would
> never have hired Mr. Welch but for his
> misrepresentation, then Mr. Welch will be in no worse
> position than he would have been but for the alleged
> illegal act.  The crucial points are that the defendant
> did hire him and did not know of the facts that might
> have led to Mr. Welch's discharge until it discovered
> them because suit was filed against it.  The defendant
> might never have learned of those facts, or it might
> have learned of them fortuitously at some later time.
> Until it did so, those facts could hardly provide an
> excuse for termination, since they could not have
> provided any part of the defendant's motive.  If Mr.
> Welch is not compensated for losses suffered between
> the time he would have been fired on account of the
> discovery of relevant facts, he is not in the same
> position he would have been in but for a wrong commit-
> ted against him, and the purpose of the protective
> legislation is entirely lost.
>         . . . The plaintiff does not seek to benefit
> from his misrepresentation, if any.  He seeks simply to
> have the law applied to him in an evenhanded way.

Id. at ____ *3.

41

serve as the foundation for a claim of fraud, conversion, or the like by the employer against the plaintiff in an appropriate forum, but only that it may not be introduced substantively for the purpose of defending against liability. We must accordingly reverse the district court's grant of summary judgment to Harleysville and remand for further consideration.

## B.  The Remedies Stage

Because the district court must proceed further with this case and may well have to reach the remedies stage, for the guidance of that court on remand we will make a few comments about the remedies facet of the case.  We note in this regard that the questions of how the after-acquired evidence may be used harmoniously with Title VII's and ADEA's language and goals, and of what remedies should inure to a plaintiff in an after-acquired evidence case, seem to be far more stubborn than the liability issue.

First, after-acquired evidence of résumé and/or application fraud or employer misconduct on the job is relevant to at least some issues at the remedies stage (and hence is admissible at that point), even if it has surfaced after the employer's searching inquiry in the aftermath of the employer's unlawful conduct or in the course of its trial preparation.[0]  The

---

[0]We observe that in a normal Title VII or ADEA case, evidence acquired before the adverse employment decision might, as a prophlactic measure, be inadmissible altogether if the plaintiff could show that the employer had a practice of thoroughly investigating the information provided in employment applications and interviews by, and of comprehensively reviewing on-the-job

court should, of course, be cautious lest the remedies evidence affect the liability verdict.

Second, at the remedies stage, the district court must bear in mind Title VII's and ADEA's two principal objects: deterrence and compensation. See Albemarle Paper, 422 U.S. at 421, 95 S. Ct. at 2373; Griggs v. Duke Power Co., 401 U.S. 424, 429-30, 91 S. Ct. 849, 853 (1971); supra at **Error! Bookmark not**

---

performance of, only or primarily only the members of a protected class with the motive to discover flaws justifying an adverse employment action, for such a practice would probably contravene Title VII and ADEA. Assuming it were so, since the filing of the lawsuit would appear to be an activity protected to the same extent as membership in another protected class, see 42 U.S.C.A. §2000e-3(a) (1981) ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."); 29 U.S.C.A. § 623(d) (1985) (similar), it would seem to follow that the aforementioned defense strategy of investigating employees who file complaints with the intent to discover evidence retroactively justifying or excusing the adverse employment decision may itself violate Title VII and ADEA, and if so it might be contrary to the design of those statutes to allow the employer to benefit from (introduce) such evidence.

Accordingly, an argument could be made that such evidence should be excluded from consideration as the fruits of unlawful retaliation even in the remedies stage of a Title VII or ADEA suit. That is, if it were the case that the calculated discovery of after-acquired evidence (as opposed to, for example, its inadvertent or independent discovery) amounts to retaliation under Title VII or ADEA, although it is exceedingly unlikely that any economic damages would flow therefrom, it may very well be that any evidence so stained would have to be suppressed at the remedies stage of the proceedings, except perhaps to show that reinstatement would threaten the public health, safety, or welfare, or would otherwise violate a public policy on par with the one antithetical to employment discrimination. This argument, however, was not advanced in this case until oral argument, and we shall decline to further consider it.

43

**defined**. n.**Error! Bookmark not defined.**.  Congress has from Title VII's inception expected courts to fashion remedies guided by the acts' twin central goals.  See Franks, 424 U.S. at 763-64, 96 S. Ct. at 1263-64.  To advance these goals, a district court is under the "`duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future.'" Franks, 424 U.S. at 770, 96 S. Ct. at 1267 (quoting Albemarle Paper, 422 U.S. at 418, 95 S. Ct. at 2372).[0]

---

[0]The same standard applies under ADEA.  As we explained in Rodriguez v. Taylor, 569 F.2d 1231 (3d Cir. 1977), cert. denied, 436 U.S. 913, 98 S. Ct. 2254 (1978):

> Monetary awards exacted from employers who practice unlawful discrimination serve two primary functions.  First, the prospect of economic penalties more certainly deters illegal employment practice[s] than does exposure to injunctive relief or prospective equitable remedies such as reinstatement.  Second, economic exactions recompense individuals for injuries inflicted by employers' discriminatory conduct.  These prophylactic and compensatory purposes are the basis of most recent anti-employment discrimination legislation, including the ADEA and Title VII.  Thus, the Supreme Court's mandate on the exercise of trial court's discretion in granting monetary relief in Title VII suits . . . is equally compelling in the context of ADEA actions . . . .
> The make whole standard of relief should be the touchstone for the district courts in fashioning both legal and equitable remedies in age discrimination cases.  Victims of discrimination are entitled to be restored to the economic position they would have occupied but for the intervening unlawful conduct of employers.

Id. at 1237-38 (citations omitted).

Third, we illustrate these points with respect to the most common remedy, backpay. The Supreme Court has laid down the general rule under Title VII that

> given a finding of unlawful discrimination, backpay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination.

Albemarle Paper, 422 U.S. at 421, 95 S. Ct. at 2373, quoted in Franks, 424 U.S. at 771, 96 S. Ct. at 1267. We have applied the same standard to ADEA. See Rodriguez, 569 F.2d at 1238 (quoting Albemarle Paper as quoted supra). But some courts cut backpay off prematurely at the moment the employer obtains the after-acquired evidence. See, e.g., Kristufek v. Hussmann Foodservice Co., 985 F.2d 364 (7th Cir. 1993); Smith, 876 F.2d at 1319 n.2 (dicta); cf. John Cuneo, 298 N.L.R.B. at 856. This formula is, however, inconsistent with the effectuation of the statutes' deterrent and compensatory purposes, and we favor the normal rule that, when otherwise appropriate, backpay should be awarded until the date of judgment. Accord Wallace, 968 F.2d at 1182; Massey, 828 F. Supp. at 323.

We reach this result by considering the statutory policies at stake. Insofar as after-acquired evidence is uncovered during the legal dispute and would not have been discovered, at least for an indeterminate stretch of time, absent the employer's unlawful acts, the plaintiff would be left in a worse position because of the discrimination if the court were to make use of that evidence to limit the victim's remedies, and the

make-whole compensatory goal of the acts would not be reached. Confining backpay to the discovery date would also dilute the deterrent effect of Title VII and ADEA, an effect best promoted with an award of backpay, see supra (quoting Albemarle Paper).

On the other end of the scale weighs the policy of allowing employers free choice (primarily encroached on by reinstatement rather than by an award of backpay), see, e.g., Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 527 (3d Cir. 1992) (citing cases), and the difficulty in ignoring such evidence insofar as it could be read as condoning the employee's misbehavior, cf. Summers, 864 F.2d at 708 ("To argue . . . that this after-acquired evidence should be ignored is utterly unrealistic.").  But the fact that courts will not turn a blind eye to employee fraud and misconduct is adequately demonstrated in cases where the employer in fact bases its adverse employment decision on the employee's wrongful actions, because then the evidence is fully considered at every stage of the dispute, and also perhaps in context of other remedies (like reinstatement) in after-acquired evidence cases.

There are occasions, of course, when after-acquired evidence is useful in measuring backpay:  if the employer can somehow insulate its illegal actions from its discovery of the disfavorable evidence, it is free to act on it (keeping in mind the prohibition against retaliation, see supra at **Error! Bookmark not defined.** n.**Error! Bookmark not defined**.) to discipline its employee, as there would be no causation.  One example is where the employer would have inevitably discovered the evidence in the

normal progression of things (that is, assuming no litigation).[0]
Alternatively, the employer may happen upon the evidence
completely independently of any investigation prompted by the
discriminatory employment action or its aftermath, including the
legal proceedings.[0]  Proof of either of these occurring would
entitle an employer to cut off all further liability from the
time the employer can establish with reasonable certainty the
date of the inevitable or independent discovery, so long as the
employer additionally shows that based upon that evidence it
indeed would have taken the same employment action at that time.
See Wallace, 968 F.2d at 1182 (ending backpay at the earlier of
(i) the date of judgment, and (ii) the date the employer can show
it would have discovered evidence, independently of the adverse
employment decision and the ensuing litigation, which would have

---

[0]See, e.g., Rodriguez, 431 U.S. at 403 n.9, 97 S. Ct. at 1897 n.9
(allowing the company to prove at trial that the applicant "would
not have been hired in any event"); Sabree, 921 F.2d at 405
(reducing damages if the employer would have inevitably
discovered that the plaintiff was ineligible for a transfer);
Smallwood v. United Air Lines, Inc., 728 F.2d 614, 626-27 (4th
Cir.) (holding that the plaintiff was not entitled to backpay
because the employer would have inevitably discovered his prior
misconduct and would not have hired him even had it not
discriminated against him), cert. denied, 469 U.S. 832, 105 S.
Ct. 120 (1984).  But see Summers, 864 F.2d at 707 n.3 ("[T]he
probability that Summers' transgressions would have been
discovered in the absence of the trial is immaterial.").
[0]See Gilty, 919 F.2d at 1249, 1255-56 (holding that a discharge
was not retaliatory because a new police chief independently
undertook a comprehensive review of all the city's officers'
credentials); cf. Welch, 23 F.3d at WL at *3 (Arnold, J.,
dissenting) (referring to the defendant's "fortuitous" discovery
of the evidence).

led it to take the same adverse action with respect to the employee); <u>Massey</u>, 828 F. Supp. at 324 (same).[0]

Fourth, we must stress in terms of policy the importance of the background rule of employer free choice. The federal anti-employment discrimination laws were designed not to impinge directly upon employer free choice; that is, not to interfere unnecessarily with legitimate business operations and decisions. <u>See</u> <u>Burdine</u>, 450 U.S. at 259, 101 S. Ct. at 1096 ("[Title VII] was not intended to `diminish traditional management prerogatives.'" (quoting <u>United Steelworkers v. Weber</u>, 442 U.S. 193, 207, 99 S. Ct. 2721, 2729 (1979)); <u>Price Waterhouse</u>, 490 U.S. at 242, 109 S. Ct. at 1786 (stressing that an "important aspect of [Title VII] is its preservation of an employer's remaining freedom of choice"). For example, the federal employment discrimination laws do not alter the employment-at-will doctrine except in limited respects. <u>See</u> <u>supra</u> at 30 & n.**Error! Bookmark not defined.**. Their goal instead is to restore the victim of the employer's illegal conduct to the position he or she would have occupied absent the discrimination.

---

[0]For example, if the inevitable or independent discovery would have preceded an applicant's hiring, probably no back pay would be due. <u>See</u> <u>Smallwood</u>, 728 F.2d at 626. By contrast, declaratory and injunctive relief as well as attorneys' fees, properly apportioned, might still be available. Moreover, in cases governed by the Civil Rights Act of 1991, the plaintiff might also be able to recover compensatory damages and, if the employer acted "with malice or with reckless indifference to the federally protected rights of an aggrieved individual," punitive damages, <u>see</u> Civil Rights Act of 1991, Pub. L. No. 102-166, § 102, 105 Stat. 1072-73 (codified at 42 U.S.C.A. §1981a(a)(1), (b)(1) (Supp. 1994)), irrespective of inevitable or independent discovery.

48

Thus, where an equitable remedy, such as reinstatement, would be particularly invasive of the employer's "traditional management prerogatives," the after-acquired evidence may bar that remedy. Cf. supra at **Error! Bookmark not defined.** n.**Error! Bookmark not defined.**.

For the foregoing reasons, we will vacate the district court's order granting summary judgment to Harleysville, and remand the case to the district court for further proceedings consistent with this opinion.